Richmond.

## McClanahan's Administrator v. Norfolk and Western Railway Company.

January 24, 1918.

(Rehearing refused, Wytheville, June 13, 1918.)

1. Adverse Possession—*Lien of Judgments against Former Owner— Case at Bar.*—In a creditor's suit the commissioner to whom the cause was referred reported numerous judgments as alive and subsisting liens on the real estate of the judgment debtor. He also reported numerous parcels of real estate liable to the lien of said judgments, and a lot which had been conveyed to the judgment debtor and which had never been conveyed to anyone by him, in the possession of a railway company, which claimed the same by the most notorious acts of adverse possession, exercised by itself and those under whom it claimed. The claim of the railway company to title by adverse possession was decisively supported by all the essential elements of such a title. Its predecessors entered into possession, before the recovery of the judgments referred to, under a color and claim distinctly adverse to, and in no wise in privity with, the title of the judgment debtor, and this possession, in most emphatic manner, had continued exclusively, uninterruptedly, visibly, notoriously, and in hostility to all other titles, for more than twenty-three years before the instant suit was brought, and for nearly thirty years before the judgment creditors asserted any claim of lien upon the property, or attempted by amended pleadings to make the railway company a party. During these decades, the adverse occupants had expended many thousands of dollars in permanent improvements on the premises.

   *Held:* That any title to the property claimed by the railway company which could be acquired by virtue of the lien of the judgments asserted in the instant suit would be a title held under the judgment debtor; that the right of action to assert such title would be in terms barred by section 2915 of the Code of 1904; and that the effect of this section cannot be avoided by resorting to a chancery suit.

2. Adverse Possession—*Title Conferred by—Privity with Former*

89

*Owner.*—The adverse occupant who has held for the statutory period does not stand in the position of a grantee from the former true owner, but his occupancy has, by authority of the State speaking through the statute, extinguished all other titles, and has vested in him an absolute and exclusive right to the possession. His title is not in any sense in privity with that of the former owner, and cannot be questioned either by such former owner or by any one claiming through him.

3. ADVERSE POSSESSION—*Title Conferred by.*—A true adverse possession for the statutory period confers upon the occupant a new, independent, unincumbered, indefeasible title, a weapon of defense and offense, good alike at law and in equity in all proceedings which call in question its validity or endanger its security. In short, such a title, though not derived from the former owner, is as good as it would be possible to acquire by deed from a former owner of a perfect title, or by a grant from the Commonwealth.

4. ADVERSE POSSESSION—*Section 2915, Code of 1904—Purpose of the Act.*—The ruling purpose and policy of this statute, which must be looked to in determining its true meaning and effect, is to give stability to land titles.

5. ADVERSE POSSESSION—*Judgment Liens—Section 2915, Code of 1904.*—In the case at bar the appellants contended that the instant case was one to enforce the lien of a judgment, not an action to recover land, and, therefore, section 2915 of the Code of 1904 did not apply; and that under sections 3567 and 3571, Code of 1904, their lien was valid and enforceable. It is true that under section 3571 of the Code the lien of a judgment may be indefinitely continued against the land of the judgment debtor in his possession, or of others holding titles derived from and in privity with him. But obviously the same rule cannot be applied to strangers who have acquired a perfect legal title not in privity with but adversely to the title of the judgment debtor. In other words, the life of a judgment may be indefinitely prolonged as to any property upon which it can operate, but whenever the right of the judgment debtor to make an entry on or bring an action to recover any land held adversely is tolled by section 2915, the right of his judgment creditor to subject such land to the satisfaction of his judgment also ceases. The lien is a vested right, but not more so than the title to which the lien attaches, and when the statute destroys the latter it necessarily destroys the former.

6. JUDICIAL SALES—*Title.*—A judicial sale of lands to satisfy liens is not a source of title, but merely a transmission of the title sold, and if at the time of the sale such title would not enable the holder thereof to make an entry or maintain an action, the purchaser cannot acquire any right of entry or action.

7. ADVERSE POSSESSION—*Judgment Liens—Section 2915, Code of 1904.*—Theoretically and technically, a suit to enforce a lien is not a suit to recover land, but a practical and rational application of section 2915 of the Code, in the light of its object and purpose, neither requires nor permits a holding that a lien (which is a mere right to sell a title for debt) stops the statute from running in favor of an adverse occupant and enables the lienor, by a judicial sale, to infuse life into a title which the statute has annihilated.

8. JUDGMENT LIENS—*Parties—Adverse Possession.*—Assuming, but not deciding, that one who has secured title to property through adverse possession is a proper party in a creditor's suit to enforce the lien of judgments against a former owner of the property, and that the question of title between a judgment debtor and an adverse claimant can be tried in a suit to enforce the judgment lien, then the statute of limitations (section 2915, Code of 1904) must be held to protect the adverse claimant if he shows sufficient facts as to the character and duration of his possession. If a legal right would be barred in a suit to enforce it in a court of law, it or an analogous equitable right will be likewise barred in a suit to enforce it in the equitable forum.

9. VENDOR AND PURCHASER—*Parol Contract for Purchase of Land—Judgment Liens Against the Vendor.*—Where the registry acts do not apply to a parol contract for the sale of land, and where the vendee has paid all the purchase money and has been put into possession so that he has a valid equitable title to the land, it is not subject to the lien of a judgment subsequently recovered against the vendor.

10. VENDOR AND PURCHASER—*Parol Contract for Purchase of Land—Judgment Liens Against the Vendor.*—In 1876 the trustees of a school district purchased a house and lot from one Rorer upon the following terms: The trustees to pay Rorer $2,500 for the lot and Rorer to take "the school house and lot on the hill" at $500 in part payment, and the residue in equal payments in one and two years. The trustees then canvassed the town for private subscriptions, and obtained good solvent subscribers to the amount of $1,220. The board then accepted Rorer's proposition and issued its bonds for $800, which, together with the house and lot on the hill and the private subscriptions, made up the price agreed. The school trustees took possession of the property thus purchased and a few years thereafter expended $2,000 in adapting it to school purposes. They appear also to have delivered possession of the house and lot on the hill to Rorer. No deed was made by Rorer to the trustees nor by the trustees to Rorer, but the bonds given by the trustees for the deferred payments were paid, and

from the record it sufficiently appeared that all the purchase money was paid before the complainants in the instant suit recovered their judgments against Rorer.

*Held:* That under the doctrine of *Floyd* v. *Harding*, 28 Gratt. (69 Va.) 401, the complainants could not subject the lot sold by Rorer to the school trustees to satisfy their judgments.

11. RECORDING ACTS—*Contracts in Writing—Case at Bar.*—The bonds referred to in the preceding headnote did not on their face refer to the contract in pursuance of which they were given, nor to the minutes of the school board, but each of them stated that it was for payment on the house and lot bought of Rorer for school purposes, and each bore an endorsement as follows: "For value received I assign the within bond to John B. Harding with permission to indulge until notified in writing to collect. (Signed) F. Rorer."

*Held:* That the assignment of the bonds to John B. Harding by F. Rorer, signed by the latter, did not constitute a contract in writing between Rorer and the school board within the meaning of the recording acts.

12. RECORDING ACTS—*Contracts in Writing—Case at Bar—Burden of Proof to Show Parol Contract.*—Assuming that the burden of proof in the instant case was upon the trustees to show that the contract was by parol, where, however, the rights of parties are made apparent on the public records, and they have allowed upwards of thirty years to elapse before they have made any investigation of the records to ascertain their rights, and the beneficiaries of the property are represented by trustees who are public officers receiving but little, if any, compensation for their services, and where, after the lapse of many years, all of the parties representing the public interest have died, and the loss of other evidence may have been sustained as incident to the change in office of the trustees, it is not to be expected that those representing the public interest will be able to establish the rights of their beneficiaries by that clear and satisfactory evidence which might be expected and demanded of a private individual looking after his own interest.

13. DOCUMENTARY EVIDENCE—*Record of School Board.*—The records of a school board are books of original entry and are admissible in evidence to show the acts of the board with reference to the purchase of property by it.

14. SCHOOLS—*Purchase of Real Estate—Contracts—Acts 1874-5, page 190.*—The act of 1874-5, page 190, providing that contracts for the purchase of real estate by public officers must be in writing, and the evidence of title must be submitted to the county court or judge for confirmation and approval, and

that no contract should be valid until the title to such real estate was approved, was not enacted for the benefit of vendors of land, but to prevent the loss of public funds by investment in property the title to which was defective. It is true that it declares that the contract shall not be valid unless and until the title to the land "be thus approved," but this does not necessarily mean that the contract shall be void. The statute, like the statute of frauds, does not go to the existence of the contract, but makes written evidence necessary to evidence it. Moreover, like the statute of frauds, the right to demand compliance with the statute is a matter personal to the parties to the contract and their privies, and cannot be insisted upon by third persons.

15. SCHOOLS—*Purchase of Real Estate—Contracts—Acts 1874-5, page 190—Case at Bar.*—In the instant case it was insisted that as the contract was not in writing and as the evidence of title was not submitted to the judge, as required by the act, the school board was not bound by it, and hence there was a lack of mutuality of right and obligation, and that, where this is lacking when the contract is entered into, no subsequent act or omission of the parties can supply its place.

*Held:* That as parol contracts for the sale of land were valid in 1876, by parity of reasoning to cases arising under the statute of frauds, the fact that the contract was not in writing and the title to the land was not approved by the court or judge, furnishes no valid reason why the contract might not be enforced, in a proper case, against Rorer, who labored under no disability to contract.

16. VENDOR AND PURCHASER—*Judgment Lien—Extent of Lien of Judgment Against Vendor.*—Where a valid contract for the sale of land has been entered into, and the recording acts do not interfere, a judgment against the vendor after the contract and before deed to the purchaser; and before the entire purchase money has been paid, is a lien on the land only to the extent of the purchase money then unpaid. Overruling *Fulkerson* v. *Taylor,* 102 Va. 314, 46 S. E. 309, so far as it declares that "in order for a purchaser under a contract which is not required to be recorded, to be protected as to subsequent judgments against his vendor, he must, before the date of such judgment, have become invested with a perfect equitable title."

17. LIEN OF JUDGMENT—*Rights of Judgment Creditor.*—Both before and since the revision of 1887, it has been held that where the recording acts do not interfere the judgment creditor can acquire no better right to the estate than the debtor himself has at the date of the recovery of the judgment.

18. Recording Acts—*Subsequent Deeds by Grantor—Notice to Purchaser.*—After a purchaser of land has put his deed to record he is not required to watch the records to ascertain whether thereafter other deeds by his grantor or judgments against him are docketed or recorded, and the same is true of deeds of trust conveying the land. The registry of a deed by a subsequent purchaser is no notice to parties who have acquired their rights before the time when the deed is registered.

19. Receivers—*Appointment—Discretion of Court.*—The appointment of a receiver is not a matter of right, but of discretion, to be governed by the circumstances of the case, one of which circumstances is the probability of the plaintiffs being ultimately entitled to a decree. It is, moreover, a power always to be exercised with caution, and never except in a strong case. The general rule is to refuse an interlocutory application for a receiver, unless the plaintiff presents at least a *prima facie* case, and the court is satisfied that there is imminent danger of loss.

20. Receivers—*Creditors' Suits—Case at Bar.*—In a suit to enforce the lien of judgments upon several parcels of real estate, the trial court refused to appoint a receiver of the property reported as liable for complainants' judgments, or to hold the parties in possession thereof liable for the use and occupation thereof. Two of the defendants were in good faith and upon reasonable grounds contesting the liability of the property owned by them to complainants' judgments, and the owners of the other property joined with the complainants in seeking to hold the property of these defendants liable, because if these properties were held liable they would probably produce sufficient to pay off and discharge the judgments, thereby relieving the property of such owners from any liability for the judgments.

*Held:* That there was no error in the ruling refusing to appoint a receiver. The rights of the parties had not been determined at the time the receiver was asked for, nor had it been ascertained and adjudicated what property should be subjected to the discharge of such judgments. In such circumstances, the appointment of a receiver whereby the parties would have been divested of the possession of their property was not proper.

21. Creditors' Suits—*Costs.*—In a creditor's suit to subject to the lien of judgments certain parcels of real estate, a bank, by its counsel, offered proof of a judgment against the judgment debtor, to which counsel for certain other judgment creditors objected, because the bank had refused to contribute anything to the cost of the suit. The master reported the judgment,

however, and the other judgment creditors excepted to the master's report on the same ground, and the trial court overruled the exception.

*Held:* That there was no error in the ruling.

22. CREDITORS' SUITS—*Costs.*—The bank offered the proof by counsel of its own selection and could not be required to contribute to the compensation of counsel of appellants. The only other costs to which it could be required to contribute were the legal and taxable costs of the suit. If no property was disclosed in the suit, it was subject to a decree against it for its due proportion of such costs, but as the record discloses abundant property out of which the costs could be made, the question becomes one of no practical importance.

Appeal from a decree of the Circuit Court of Montgomery county.

*Affirmed in Part; Reversed in Part.*

The opinion of Judge BURKS states the case.

*Randolph Harrison, R. E. Scott, Samuel A. Anderson, H. F. Hall, T. W. Miller, C. S. McNulty, M. M. Caldwell, Jackson & Henson,* and *H. M. Moomaw,* for the appellants.

*Roy B. Smith, Everett Perkins, S. Hamilton Graves, L. H. Cocke, Staples & Cocke, R. I. Roop,* and *Woods, Chitwood & Coxe,* for the appellees.

KELLY, J.:

Assuming that the record does not show that the whole of the purchase price of the school property was paid before the appellants' judgments were recovered, we fully concur in the views expressed and the conclusions reached by Judge Burks in regard to the liability of that property. We think further, however, that the record does sufficiently show that the purchase money was all paid before the rendi-

tion of the judgments, and, hence, that under the doctrine of *Floyd* v. *Harding,* the school property is not liable.

As to the property of the Norfolk and Western Railway Company, we are of opinion that the defense based upon adverse possession is good.

The claim of the railway company to title by adverse possession is decisively supported by all the essential elements of such a title. Its predecessors entered into possession in 1883 under a color and claim distinctly adverse to, and in no wise in privity with, the Rorer title, and this possession, in most emphatic manner, had continued exclusively, uninterruptedly, visibly, notoriously, and in hostility to all other titles, for more than twenty-three years before this suit was brought, and for nearly thirty years before the appellants asserted any claim of lien upon the property, or attempted by amended pleadings to make the railway company a party. During these decades, the adverse occupants had expended many thousands of dollars in permanent improvements on the premises.

One of the distinct defenses of the company, as shown by both answers filed by it, rests upon the claim that its possession under Waid and Terry was adverse and hostile from the beginning and in no way connected with Rorer. In the petition upon which this appeal was granted it is said that, "the lands in the possession of the said railway company * * * were shown to be * * * the property of said Rorer. * * * The said railway company was in possession of the lot conveyed to Rorer by Trout, claiming title thereto by adverse possession * * *" The report of Commissioner Ellett, according to a statement in the petition for appeal, verified by the record, shows "that Rorer's title to the half interest in the lot was good, that he had never conveyed that interest to any one, and that the Norfolk and Western Railway Company was in possession without any title." The report of Commissioner Stuart shows that

"counsel for the judgment creditors request your commissioner to report especially as to Norfolk and Western office lot that there was no sale of the property by Rorer & Son, or by the said F. Rorer." The decree of the circuit court from which the present appeal was granted contains the following paragraph: "As to the liability of the property conveyed by John Trout and wife to F. Rorer & Son, by deed dated the fifth of May, 1874, and now held and claimed by the defendant, the Norfolk and Western Railway Company, Commissioner Stuart reports that there was no sale or conveyance by F. Rorer of his interest or estate in said property, and that there was no sale or conveyance of said property by F. Rorer, or by F. Rorer & Son, or by F. Rorer and P. H. Rorer, and there being no exception to this finding in said report, said report is in respect thereto confirmed; and the court, now proceeding to pass upon the several defenses of the said Norfolk and Western Railway Company, as presented by its answer and several exceptions to said report, is of opinion that said railway company has held said property for more than fifteen years prior to the institution of this suit adversely to said F. Rorer and those claiming under, by or through him." In the agreed statement of facts it appears that the Roanoke Land and Improvement Company and its successors in title, similarly claiming under the deed from Waid and Terry, continued in the actual, uninterrupted, open, notorious and exclusive possession of said land, *claiming complete title thereto* up to the present time, etc. The fact being conclusively shown that Rorer never parted with his title, this provision in the agreed statement of facts necessarily means that the railway company and its predecessors in title claimed a good and complete title as against Rorer. The cause has been proceeded in from the beginning by the creditors upon the claim and theory that Rorer owned the property and never sold it. This theory was sustained by the commissioners,

and their finding, without any exception thereto, was confirmed by a solemn adjudication of the court. No error in this respect is or could be assigned by the appellants.

To set out in detail the facts as to the possession of the property and its extensive improvement by the occupants would uselessly prolong this opinion. Suffice it to say that the possession of the railway company, and of those under whom it claims, began before the recovery of the judgments, and that long before this suit was brought it had acquired, by all the tests recognized in the law, as perfect and complete title as it is ever possible to acquire by a true and typical adverse possession.

The important question for decision, therefore, is, What sort of title does adverse possession, in its true legal sense, confer? We think the answer of both reason and authority is that the title thus conferred is good against the world.

The soundness of this conclusion depends, of course, upon the construction and application of section 2915 of the Code. That section, so far as material here, is as follows: "No person shall make an entry on, or bring an action to recover, any land lying east of the Alleghany mountains, but within fifteen years * * * next after the time at which the right to make such entry or bring such action, shall have first accrued to himself or to some person through whom he claims."

This statute in Virginia, and statutes of substantially the same tenor and effect in the other States, constitute the foundation for all title by adverse possession in this country. The ruling purpose and policy of these statutes, which must be looked to in determining their true meaning and effect, is to give stability to land titles.

"The acquisition of title to land by adverse user is referable to and predicated upon the statutes of limitations in force in the several States, which, in effect, provide that an uninterrupted occupancy of lands by a person who has

in fact no title thereto, for a certain number of years, shall operate to extinguish the title of the true owner thereto, and vest a right to the premises absolutely in the occupier. The object of these statutes is to quiet the titles to land, and prevent that confusion relative thereto which would necessarily exist if no period was limited within which an entry upon lands could be made; and they are believed to be of even more importance to the interests of society than those relating to personal actions." 2 Wood on Limitations (4th ed.), section 254, page 1219.

"The best interests of society require that causes of action should not be deferred an unreasonable time. This remark is peculiarly applicable to land titles. Nothing so much retards the growth and prosperity of a country as insecurity of titles to real estate." *Lewis* v. *Marshall* (U. S.), 5 Peters 470, 477, 8 L. Ed. 195, 197.

It is not surprising, therefore, that we should find, as we do find, that, carrying into practical meaning and usefulness, this wise and settled policy and object of the statutes prescribing a limitation to actions for the recovery of lands, the authorities are practically unanimous in ascribing to them the effect of vesting in an adverse occupant who comes within their terms a new, independent and indefeasible title—one paramount to and good against that of all other persons, no matter how or when such other title may have been derived or in what form or forum it may be asserted or sought to be made effective. Less than this would not accomplish the purpose of the legislation.

The adverse occupant who has held for the statutory period does not stand in the position of a grantee from the former true owner, but his occupancy has, by authority of the State speaking through the statute, extinguished all other titles, and has vested in him an absolute and exclusive right to the possession. His title is not in any sense in privity with that of the former owner, and cannot be ques-

tioned either by such former owner or by any one claiming through him. Some expressions are to be found in the text books and decisions on this subject which, standing alone, might seem to indicate that the adverse occupant merely takes over the title of the former owner. It will usually, if not always, be found, however, that such expressions occur only in a connection which assumes a perfect title in the former owner, and are used only as a means of conveying the idea that adverse possession confers a title complete and perfect for all purposes. For example, if the instant case presented no question of liens, but a controversy directly between Rorer and the railway company, it would be quite natural and appropriate to say that the company's title was as perfect and complete as if it held a deed from Rorer, for the simple reason that this case has been dealt with throughout as if Rorer's original title was perfect. This, however, would be far from saying that the railway company's title was derived from, or in privity with, Rorer. And so, notwithstanding utterances in the books which refer to title by adverse possession as being "as effectual as a conveyance from the owner," "tantamount to a conveyance," "as full and complete as could be conferred by the owner of the fee," and the like, it is considered safe to say, after an exhaustive examination of the authorities, that no substantial support can be found upon which to base any contention that an adverse occupant, in the true legal sense of that term, takes his title in privity with, or subject to any incumbrances or defects created or suffered by, the former owner. It would be a palpable contradiction to say, as the authorities in the main certainly do say, that adverse possession confers *a new and perfect title,* and then to say also that the title thus conferred is liable to be defeated by defects affecting a title formerly held by some other person. No such contradiction in fact exists to any appreciable degree.

It must be understood that by "adverse possession" we mean a possession which presupposes a disseisin of the rightful occupant, and not a possession under or through the latter. It is true that in a certain sense a grantee of the rightful owner holds the land conveyed to him adversely to all the world, acknowledging title in no one and being no one's tenant; but his possession is rightful, and there is no outstanding right of action in another upon which the statute can operate. In the instant case, there was a disseisin of the acknowledged rightful owner in 1883, and there was never a time afterwards, until the period of limitation had expired, when the right of action against the disseisor did not exist.

To summarize our conclusions, at the risk of some repetition, which we think is justified by the importance of the question, we are of opinion that the better reason and the clear and unmistakable result of the authorities is to the effect that a true adverse possession for the statutory period confers upon the occupant a new, independent, unincumbered, indefeasible title, a weapon of defense and offense, good alike at law and in equity in all proceedings which call in question its validity or endanger its security. In short, such a title, though not derived from the former owner, is as good as it would be possible to acquire by deed from a former owner of a perfect title, or by a grant from the Commonwealth.

"The effect of these statutes generally is, not to transfer the fee to lands from the true owner to the occupier, but to destroy the remedy of the true owner for their recovery by action, and to vest an absolute right to exclusive possession in the occupier as against the true owner and all the world, and a right which is transferable and vests in his grantees a right to the lands as full and complete as could be conferred by the owner of the fee. In a word, it vests in the occupier a title to the premises by possession, which is in

every respect equal to a conveyance of the fee." 2 Wood on Limitations, section 254, page 1220.

"He (the occupant) has an indefeasible title which can only be divested by his conveyance of the land to another, or by a subsequent disseisin for the statutory limitation period." 1 Ruling Case Law, page 690, section 5.

"The title acquired by adverse possession is a title in fee simple, and is as perfect as one by deed from the original owners, or by patent or grant from the government." 1 Cyc. 1135.

"A covenant to convey a perfect title is satisfied by conveying a title acquired under the statute." *Hughes* v. *Graves*, 39 Vt. 359, 94 Am. Dec. 331.

In a copious note on "The Rights and Title Gained Under Adverse Possession," 15 L. R. A. (N. S.) pages 1255, 1257, the annotator says: "An adverse possession which has fulfilled all the legal conditions confers a good title, when completed, upon him who has maintained it. The title has been variously described as a good legal title, valid, perfect, complete, full and complete, a complete investiture of title, a fee-simple title, an indefeasible right, an indefeasible title in fee, equivalent to a grant, and an absolute and perfect title in fee-simple. The language of many of the courts can hardly be made stronger. The authorities in support of the conclusions stated are exceedingly numerous and embrace the courts of practically every jurisdiction in the United States." Citing a multitude of cases both State and Federal.

We refer further to the following authorities, no one of which is cited as covering all of the propositions which we have announced, but which, in the aggregate, will be found to do so fully: 2 Min. Inst. (4th ed.), 577; 2 Min. Real Prop., section 1021; 1 Am. & Eng. Ency. Law (2d ed.), 883; 2 Corpus Juris. 254, and cases cited in notes 81 and 82; *Creekmur* v. *Creekmur*, 75 Va. 430, 435; *Drumright* v.

*Hite,* 2 Va. Dec. 465, 26 S. E. 583; *Hollingsworth* v. *Sherman,* 81 Va. 668; *Sherman* v. *Kane,* 86 N. Y. 57, 64; *Bowen* v. *Suander,* 121 Ind. 164; *Parker* v. *Metzger,* 12 Ore. 407, 7 Pac. 518; *Leffingwell* v. *Warren,* 2 Black (U. S.) 599, 17 L. Ed. 261; *Bicknell* v. *Comstock,* 113 U. S. 149, 28 L. Ed. 962, 5 S. Ct. 399; *Campbell* v. *Holt,* 115 U. S. 620, 623, 29 L. Ed. 483, 485, 6 S. Ct. 209; *Sharen* v. *Tucker,* 144 U. S. 533, 36 L. Ed. 535, 12 S. Ct. 720; *Northern P. R. Co.* v. *Ely,* 197 U. S. 1, 7, 49 L. Ed. 639, 641, 25 S. Ct. 302; note to *Menzel* v. *Hinton,* 95 Am. St. Rep. 647, 672. Citations to the same effect as these might be multiplied indefinitely.

We have been referred to no case and we have found none in conflict with the views above indicated. The appellants contend that this is a suit to enforce the lien of a judgment, not an action to recover land; that, therefore, section 2915 of the Code does not apply; and that under sections 3567 and 3571 their lien is valid and enforceable. This contention loses sight of the plain terms and the governing purpose of section 2915, and, if sustained, would largely devitalize that section. It is true that under section 3571 of the Code the lien of a judgment may be indefinitely continued against the land of the judgment debtor in his possession, or of others holding titles derived from and in privity with him. This is forcibly illustrated by our decision to-day in the companion case of *Moomaw* v. *N. & W. Ry. Co., post,* page 782, in which we are enforcing the same judgments involved in the instant case because grantees of Rorer failed, like the vendee in *Flanary* v. *Kane,* to record their deeds. But obviously the same rule cannot be applied to strangers who have acquired a perfect legal title not in privity with but adversely to the title of the judgment debtor. In other words, the life of a judgment may be indefinitely prolonged as to any property upon which it can operate, but whenever the right of the judgment debtor to make an entry on or bring an action to recover any land held adversely is tolled by

section 2915, the right of his judgment creditor to subject such land to the satisfaction of his judgment also ceases. The lien is a vested right, but surely not more so than the title to which the lien attaches, and when the statute destroys the latter it necessarily destroys the former. A judicial sale of lands to satisfy liens is not a source of title, but merely a transmission of the title sold, and if at the time of the sale such title would not enable the holder thereof to make an entry or maintain an action, the purchaser cannot acquire any right of entry or action. To be sure, section 2915 does not mention judgment creditors or suits to enforce liens, but there is a very good reason why it does not. It was intended to protect the possession of the adverse occupant after the expiration of the limitation period, and, since judgment creditors have only such power to disturb the possession of real estate as they may acquire through the owner, there was no reason for including them in the express words of the statute. The bar of the statute becomes complete after fifteen years from the time a right of action first accrues either to the holder of the particular title in question or to some one through whom he claims. The effect of the statute is to vest a complete title in the occupant whenever the right of action has existed and remained unexercised for the statutory period. This principle is recognized in *Hollingsworth* v. *Sherman* (an action of ejectment), 81 Va. 668, 672, as follows:

"The defendants claim that the period of limitation had long since run, and their title had been perfected by reason of their adverse possession before the suit of the plaintiff was instituted. The plaintiff seeks to excuse her delay in bringing her suit upon the ground that her ancestor conveyed this property to trustees in 1824, to pay debts, and that the debts were only fully paid and the land released by the trustees in 1880, and that, until the release to her, she could not maintain ejectment. Citing *Hopkins* v. *Ward*, in

this court, reported in 6 Munf. (20 Va.) 38; *Syrus* v. *Allison*, 2 Rob. (41 Va.) 200, 210; *Lincoln* v. *French*, 105 U. S. 614, 26 L. Ed. 1189; *Pratt* v. *Pratt*, 96 U. S. 704, 24 L. Ed. 805, in the Supreme Court of the United States, and *Coulter* v. *Philips*, 20 Pa. 154, and other cases.

"But the question arising in this case is not whether she could sue, or the trustees could sue, to recover the land held under the trust deed. In this case, neither the grantor in the deed, the ultimate *cestuis que trust*, nor the trustee did sue, until the release by the trustee; and if, as claimed by the plaintiff, she could not sue until the release to her, or until the debt was satisfied, it cannot be claimed that the person clothed with the legal title could not maintain ejectment under our statute."

And, so in this case, when the creditors claim that they could not sue because their rights were not invaded and they had no right of action, the answer is, as in the *Hollingsworth Case*, "it cannot be claimed that the person clothed with legal title could not maintain ejectment under our statute."

Theoretically and technically, a suit to enforce a lien is not a suit to recover land, but a practical and rational application of section 2915 of the Code, in the light of its object and purpose and of the authorities to which we have referred, neither requires nor permits us to hold that a lien (which is a mere right to sell a title for debt) stops the statute from running in favor of an adverse occupancy and enables the lienor, by a judicial sale, to infuse life into a title which the statute has annihilated.

The decision in *Flanary* v. *Kane*, 102 Va. 547, 46 S. E. 312, 681, so strongly relied upon by counsel for appellants, is not, in our opinion, in conflict with the conclusions we have announced. Upon the contrary, that case, and the case of *Pratt* v. *Pratt*, 96 U. S. 704, 24 L. Ed. 805, which it follows as authority, will be found upon analysis to furnish

91

illuminating illustrations of the true doctrine applicable to the facts of the instant case. Those cases did not involve questions of genuine adverse possession. In *Flanary* v. *Kane,* the defense was sought to be made that the defendants had acquired title against the judgment creditors by adverse possession, but as a matter of fact the possession was not adverse. There was not in that case, as there is here, a conflict of title. The possession, so far as the former owner and his creditors were concerned, was rightful from the beginning. The so-called adverse occupant held and claimed title by, through and under the judgment debtor. The judgments were obtained after he had sold to the predecessors in title of the defendant but before the title bond and deeds under which the defendant claimed were recorded, so that the judgments were, by virtue of the registry acts, which ruled the decision absolutely, given priority over the documentary title. As stated in the opinion, "the right of the judgment creditors to subject the land to the lien of their judgments, recovered after the judgment debtor had parted with his interest therein, resulted from the failure of his vendee to comply with the registry acts." In the instant case no question under the registry acts arises, for the simple reason that the railway company does not claim as a purchaser. The distinction between the two cases is perfectly obvious. In *Flanary* v. *Kane,* the judgment debtor had parted with his title and the occupant was holding under and in privity with it; the possession was rightful and there was no one who had the right to sue for possession. No right to sue having accrued to any one, section 2915 could not operate. The instant case presents exactly the opposite state of facts. The possession of the railway company was not under but against the title of the debtor, Rorer, and there never was a time from the beginning of that adverse possession, until it ripened into a perfect title by limitation, when he did not

have the right to bring his action. It is interesting to note that, as appears from the briefs which are extant and available, the very able and learned counsel representing the judgment creditors in *Flanary* v. *Kane* conceded that if the defendants had derived their title through sources different from and adverse to the title of the judgment debtor, the defense of adverse possession would have been good.

There are, undoubtedly, passages in the opinion in *Flanary* v. *Kane* which, without the light of the exact facts with which the court was dealing, would support the contention of the appellants. We do not think, however, that the court would have decided *Flanary* v. *Kane* in favor of the judgment creditors if the defendant in that case had held, as the railway company has done in this case, under an adverse title, and if the distinction which we have recognized had been as fully presented as it has been in this case. We do not question the entire correctness of the result in *Flanary* v. *Kane.*

The case of *Pratt* v. *Pratt, supra,* is likewise easily distinguishable from the present case, and illustrates, like *Flanary* v. *Kane,* the difference between a true and a so-called adverse possession. In the *Pratt Case,* a judgment debtor had conveyed land which was subject to the lien of a judgment. After his grantee had been in possession for the statutory period, the judgment creditor brought a suit to enforce the lien. There was a judicial sale and the purchaser brought ejectment against the debtor's grantee. The latter relied upon the statute prescribing a limitation (seven years) to actions for the recovery of land. The United States Supreme Court, after stating the case, said: "It is obvious from this recital that there was no one who could lawfully enter upon the land in the defendant's (judgment debtor's grantee) possession until the plaintiff's judgment lien had become perfected into a legal title by sale and conveyance." And further: "There must be a right of entry

in some one else to be tolled by this seven years' possession, and the possession must be adverse to this right of entry." And further: "In the case before us, plaintiff sued within five years after his lien became a title. Two of the seven years' possession on which the defendant relies was at a time when the plaintiff had no title and, consequently, no right of action, and while none existed in those from whom he derives title." These quotations from the opinion in *Pratt* v. *Pratt* are quite sufficient to show that the decision in that case was in no way in conflict with the conclusion which we have reached in the instant case.

The same distinguishing principle is affirmatively recognized in *Coulter* v. *Philips*, 20 Pa. 154, 156, cited and relied upon in *Pratt* v. *Pratt*. In that case also the action was ejectment. The plaintiff claimed under a sale to satisfy a judgment lien, and the defendant under a so-called adverse possession. The Supreme Court of Pennsylvania held that the statute of limitations was not available as a defense, but clearly pointed out that if the title of the adverse occupant had not been derived through the judgment debtor then it could not be subject to liens against a title with which it was not in privity. The court said: "A judgment creditor acquires a lien on all the interest that the defendant has in real estate in the county, and the debtor cannot affect it by any conveyance he may make of his estate. * * * A title paramount to the defendant, or twenty-one years' adverse possession by an intruder or stranger to the defendant, may avail to defeat the rights and remedies of a lien creditor. A possession that would bar the debtor would divest the rights of his creditor. But a party coming into possession *under* and *according to* the title of the defendant (the judgment debtor) takes it *cum onere*, and the creditor's relation to the land remains unchanged."

In *LeRoy* v. *Rogers*, 30 Cal. 229, 89 Am. Dec. 88, the material facts were as follows: A man named Leese, who

held the legal title to land under a patent dated March 2, 1858, executed a mortgage to one Vallejo. The mortgage was judicially foreclosed in 1860 and the land was sold, but the deed was not delivered to the purchaser until 1862. The mortgage constituted merely a lien on the land, and was substantially the same as a judgment. At the date of the issuance of the patent to Leese, one Rogers was in possession of the land, but, as adverse possession does not run against the State, his adverse occupancy did not begin to operate until the State had parted with its title by grant to Leese. As soon as this was done, the possession of Rogers became in a true legal sense adverse to Leese, a right of action at once accruing to the latter, and the statute of limitation (five years) at once beginning to run against that right. In 1864, less than five years from the date on which the purchaser acquired his title under the foreclosure, but more than five years after the statute had commenced to run in favor of Rogers and against Leese, parties claiming under the foreclosure sale brought an action of ejectment against Rogers, who rested his defense upon adverse possession. From this statement, and from the following quotation, it will be seen that this case of *LeRoy* v. *Rogers* involved the question now before us. The opinion of the California court is so directly in point that we quote somewhat fully from it, as follows:

"The plaintiffs raise the point that they are not barred by the lapse of time, because, as they say, their right of action first accrued in 1862, upon the execution of the sheriff's deed in pursuance of the judgment of foreclosure of the mortgage of Leese to Vallejo. We do not find that the point has heretofore been presented to the court, but it is more plausible than real, and its solution is not difficult.

"It will not be contended that a right of action accrues successively to each of the several purchasers of the same parcel of land, in the sense in which that term is used in

statutes of limitation, as against the person in adverse possession, at the time of the first purchase. Were it so, it would be in the power of any one to avoid the statute by simply conveying the land during the running or after the expiration of the five years. The plaintiffs, to maintain their proposition, must demonstrate that a purchaser at a foreclosure sale comes in under an independent title—that his title is not the title of a mortgagor, but a title that then first sprang into being, or is derived from a title then existing, but that did not confer the right of entry. Where one, possessing only those rights in the land that grow out of prior possession, is ousted after the expiration of five years, he is barred of his recovery; and if he thereafter acquires the title from the general government, it may properly be said that he then acquires an independent title, and that a right of action then accrues to him against the adverse possessor. And the remainderman, upon the expiration of the particular estate, does not come in under it, but claims through an independent source of title, and he has his action though the particular estate may have been cut off from a recovery against the adverse possessor. But such is not the case with the purchaser at the foreclosure sale. His estate in the land is the estate that the mortgagor had, and he is assignee of the mortgagor, in every sense, so far as the title is concerned, that he would have been had the mortgaged premises been conveyed directly by the mortgagor, instead of indirectly and through the operation of a judicial sale. He does not differ in this respect from one who purchases at an official sale, made in satisfaction of a judgment lien."

If the Vallejo mortgage, in the case last cited, had not been foreclosed until 1864, and, instead of an ejectment suit by the purchaser, the case confronting the California court had been a foreclosure suit to which Rogers had been made a party, there can be no doubt that the obvious and sub-

stantial rights of the parties would have led to the same result as that which was reached in the ejectment suit. Neither can we, in the instant case, permit a suit in equity to take the place of an action at law without applying to the equity suit the statute which was designed to bar the action. That statute, as already pointed out, did not mention equity suits to foreclose liens for the plain reason that they are not appropriate proceedings to try title. Whenever they are so used, the bar of the statute must be recognized. (*Drumright* v. *Hite, supra.*) The statute cannot be nullified by indirection.

The decision in *LeRoy* v. *Rogers* evidently proceeds upon the sound theory that a judicial sale is a mere means of transferring title, and that the application of the statute does not depend upon the form of the creditor's remedy, or upon his right to sue, but depends upon the existence or non-existence, during the statutory period, of a right of action in the title upon which the lien rests.

The decision in *LeRoy* v. *Rogers* also furnishes a convenient answer to the suggestion that adverse possession against a life tenant does not bar an action by the remainderman, and that for a like reason it ought not to bar a creditor, since the adverse possession invades the rights of neither. The remainderman "does not come in under" the particular estate, "but claims through an independent source of title." See also *Pryor* v. *Winter,* 147 Cal. 554, 558, 82 Pac. 202, 109 Am. St. Rep. 162. So, too, an owner of the minerals under a title which has been severed from the title to the surface, is not affected by adverse possession of the surface, because there has been no disseisin as to the minerals, and neither such owner nor any one for him has any right of action against the adverse occupant.

We are not without Virginia authority which seems to us directly in point. In the case of *Virginia & West Virginia Coal Company* v. *Green Charles,* reported in 3 Va. Law Reg.

(N. S.), at page 492, the effect of a tax lien as against a title by adverse possession is interestingly discussed. The opinion is by Judge Henry C. McDowell, of the District Court for the Western District of Virginia, whose recognized learning, ability, and wide experience at the bar and on the bench with questions involving the land laws of Virginia entitle his views to great respect. He deals with the question as follows:

"Under statutes such as those of this State, the title of the tax purchaser is a derivative title. *McDonald* v. *Hannah*, 51 Fed. 73, 74; *McDonald* v. *Hannah*, 59 Fed. 977, 980. See Blackwell Tax Titles (1st ed.), sections 232-3, page 548: 'Where the law requires the land to be listed in the name of the owner of the fee or of any other interest in the estate, provides for a personal demand of the tax, and, in case of default, authorizes the seizure of the body or goods of the delinquent in satisfaction of the tax, and, in terms or upon a fair construction of the law, permits a sale of the land only when all other remedies have exhausted, then the sale and conveyance by the officer passes only the interest of him in whose name it was listed, upon whom the demand was made, who had notice of the proceedings, and who alone can be regarded as legally delinquent. In such case *the title is a derivative one,* and the tax purchaser can recover in ejectment only such interest as he may prove to have been vested in the defaulter at the time of the assessment.' If the contention of the plaintiff be upheld, we must construe section 661 as being in conflict with section 2915—the statute of limitation. 'No person shall * * * bring an action to recover any land lying west of the Alleghany mountains but within ten years next after the time at which the right * * * to bring such action shall have first accrued to *himself or to some person through whom he claims.'* But if section 661 be construed as the defendant contends this conflict is avoided, and this

fact affords a reason of some weight for adopting the construction of section 661 above chosen. 36 Cyc., page 1146; 26 Am. & Eng. Encyc. 616-17-18; Black Interp. Law (1st ed.), page 17, 60-61; 1 Fed. Stats. Ann. XCIII, 31-b; Sutherland Stat. Constr. (1st ed.), section 288.

"Counsel for plaintiff build up a somewhat plausible argument on the decisions holding that the State's lien for taxes is a paramount lien. It is true that Pearson could not have encumbered the land by any lien, even to the suffering of a judgment lien, either before or after the first of January, 1876, which would not have been subordinate to the tax lien and which would not have been extinguished by the tax sale. It is also true that a sale, or devise of the land by Pearson, or a transmission of his title by descent, after the said date could not affect the validity of the tax sale. But it does not follow that the ripening of Ratliff's title by adversary possession is also nullified by the tax sale. The difference is that all such lienors, vendees, devisees or heirs acquire their rights through and under Pearson. Ratliff acquired his right in opposition to Pearson. Any one who acquired a lien on the land from Pearson's predecessors in title, and any one who acquire a lien on or the ownership of the land from or under Pearson, are his privities in title. Ratliff is a stranger to the Pearson title.

"Counsel ask what would have been the result if the tax sale had been held on January 2, 1879. I think the answer is that the State would in such event have offered a wholly worthless tax title for sale. It is perfectly true that, if the Pearson title was in 1876 a valid title, by assessing him with the taxes for that year the State acquired a valid and valuable lien on the land. But there is certainly no Virginia decision, so far as I know, which holds that delay in foreclosing this lien, accompanied by the ripening of an adverse possession of the land by a stranger to the taxpayer, may not make the lien valueless. And I can see no

reason why the result should be otherwise. If the position I take be sound, it is entirely true that a well advised proposing tax purchaser would not buy at a tax sale, where an adverse title had ripened before the tax sale is held, or will ripen so soon after the tax sale that suit cannot be instituted before the adverse title ripens. And it follows that the tax lien is, or may be, in such case valueless."

The italicized language appearing in the above quotation from Judge McDowell's opinion indicates the weakness in the appellants' position in this case. It is true that here they are seeking to pass the title of Rorer and to try the railway company's title in the same proceeding, thus avoiding an action of ejectment against the latter. It cannot, however, be seriously contended that the substantial rights of the parties can be affected by the form of the procedure. *The purchaser must claim under Rorer,* and must, therefore, come within the plain language of section 2915 of the Code, which, *in terms,* bars an action not only as to the party to whom the right first accrued (Rorer) *but as to those claiming through him.*

We are of opinion, therefore, that the property of the Norfolk and Western Railway Company is entitled to immunity from the lien of the appellant's judgments on the broad ground that a true adverse possession confers a perfect title free from defects created or suffered by the former owner. We have, however, already pointed out that the judgments owned by the appellant were recovered *after* the adverse possession had commenced to run against Rorer. In the light of this fact, there is another and further very strong view of the effect of adverse possession in this case which is forcibly presented by Judge Sims in a separate opinion handed down by him, and in which he concurs in the result arrived at by us; and inasmuch as it is not essential to the decision in this case that we should go further, a majority of the court is of opinion that the decision herein

should be limited as a precedent to cases in which liens have been obtained subsequent to the beginning of the adverse occupant's claim of title. (See 1 Min. on Real Prop., section 145, page 182.)

The sum and substance of our decision is, that any title to the property claimed by the Norfolk and Western Railway Company which could be acquired by virtue of the lien of the judgments asserted in this suit would be a title held under Rorer; that the right of action to assert such title would be in terms barred by section 2915 of the Code; and that the effect of this section cannot be avoided by resorting to a chancery suit. We have not held that the creditors could not sell the right, title and interest of Rorer himself and pass such rights as he would have to the purchaser at a judicial sale. This could have been done in the instant case either, (1) by originally omitting the Norfolk and Western Railway Company as a party, or (2) by dismissing the cause as to that company when the character of its title was disclosed, or (3) by a decree for sale, subject to the right of the company to assert that title in any action at law by the purchaser at the judicial sale. The appellants have not asked for or desired such a sale. Manifestly it would avail them nothing.

We do not decide the question raised by counsel in the instant case as to whether the railway company can be regarded in the light of the facts as a proper party. There is certainly very respectable authority to support the view that it cannot be so regarded. *Dial* v. *Reynolds,* 96 U. S. 340, 24 L. Ed. 644; *Banning* v. *Bradford,* 21 Minn. 308, 18 Am. Rep. 398; *Croghan* v. *Spence,* 53 Cal. 15. But while passing this question, we may well suggest that if the railway company had never been made a party, and there had been a judicial sale of the property to satisfy the judgments, the purchaser would necessarily have stood just where Rorer would stand, and could, no more than he, recover

the premises. Such purchaser, as in *LeRoy* v. *Rogers, supra,* would be powerless in the face of the railway company's adverse possession which has not only extinguished the Rorer title but created and conferred on the defendant company a brand-new and indefeasible one, which cannot be sold for Rorer's debts. See *Va., etc., Co.* v. *Charles, supra.*

Dealing with the case as it is, however, and assuming that the question of title between a judgment debtor and an adverse claimant can be tried in a suit to enforce the judgment lien, then the statute of limitations must be held to protect the adverse claimant if he shows, as the railway company has done in this case, sufficient facts as to the character and duration of his possession. As Judge Riely said in *Drumright* v. *Hite, supra,* "If a legal right would be barred in a suit to enforce it in a court of law, it or an analogous equitable right will be likewise barred in a suit to enforce it in the equitable forum."

We are not at all satisfied that there are not other grounds (two of them discussed by Judge Burks) upon which the decree as to the railway company should be affirmed, but we are content to rest our decision upon the defense of adverse possession.

Except as indicated herein, we concur in all respects in the opinion delivered by Judge Burks.

WHITTLE, P. and PRENTIS, J., concur in the opinion of KELLY, J.

BURKS, J.:

This is a lien creditors' bill filed by several judgment creditors of Ferdinand Rorer, suing for the benefit of themselves and all other lien creditors of the said Rorer who would contribute to the expense of the suit, for the purpose of subjecting his real estate to the payment of the liens

thereon. The bill was several times amended and supplemented, and various petitions were filed in the case. A number of questions as to procedure were raised, all of which were disposed of on the former hearing of this case. *McClanahan's Adm'r* v. *Norfolk & Western Ry. Co.*, 118 Va. 388, 87 S. E. 731. On that hearing this court, among other things, decided the following points:

(1) An amendment of a lien creditors' bill which sets out in detail other lands bound by the plaintiff's judgments and brings before the court all those who claim to be interested in those lands adversely to the lien creditors, is not a departure from the original bill, and does not make a new case, although it contains some averments not contained in the original bill; and as to lien creditors who subsequently prove their debts in the case, the filing of the bill stops the running of the statute of limitations.

(2) The removal of the judgment debtor from the State is of itself an obstruction to a suit to enforce the judgment, and the statute of limitations does not run against the judgment while the debtor remains out of the State.

(3) A judgment which is a lien on land in the hands of an alienee of a judgment debtor, and which is not barred as against the debtor because of his removal from the State, may be enforced against the lands in the hands of such alienee, although the latter has in no way obstructed the prosecution of the plaintiff's rights. Section 2933 of the Code does not apply to such case.

(4) The doctrine of laches has no application to a suit to subject land in the hands of the judgment debtor or his alienees to the lien of the judgment. The judgment is an express, absolute, statutory lien on the debtor's real estate, and the right to resort to a court of equity to enforce it is a legal right, without terms or conditions, and continues during the life of the judgment.

The correctness of the above propositions cannot now be

called in question, even if we were disposed to do so, as they have become the law of the case. *Steinman* v. *Clinchfield Coal Corporation*, 121 Va. 611, 93 S. E. 684.

On the former hearing, the cause was heard on an appeal from decrees of the trial court sustaining demurrers to appellants" several bills and petitions, and refusing to hear the cause on the master's report. The demurrers, of course, admitted all facts stated in said bills and petitions that were well pleaded, and the decision on the former hearing was based on such admissions. Facts controverted by the answers were not considered, and as to these the cause is still at large and undecided. Upon the allegations of the bill, admitted by the demurrer, it was held that the Norfolk and Western Railway Company was a proper party to the suit, but upon the facts set up in its answer, no decision was rendered as to the propriety or necessity of making it a party. This court also declined to pass on the report of the commissioner in chancery, but remanded the cause to the trial court where it was declared that the details of the report could be more safely worked out.

When the case was remanded, the trial court refused to pass on exceptions to the commissioner's report, and referred the cause to another commissioner with directions to re-execute the order of reference which had been previously entered in the cause. Under this new reference, the commissioner made a report of the liens against Ferdinand Rorer's estate, and their relative priorities, and of the lands subject to the liens of the judgments proved and the order in which said lands were to be subjected. To this report various exceptions were filed by the landowners, which raised most of the questions to be hereinafter considered. So much of the evidence as is necessary will be stated in connection with the consideration of these various exceptions.

The commissioner to whom the cause was referred re-

ported numerous judgments against Ferdinand Rorer recovered in the years 1884, 1885 and 1886, and stated the order of their priority. These judgments were all reported as alive and subsisting liens on the real estate of the defendant Rorer. He also reported numerous parcels of real estate liable to the lien of said judgments, and the order of their liability. In the class of unaliened lands, the commissioner placed an undivided one-half interest in a parcel of land containing one acre, which was conveyed to F. Rorer & Son by John Trout and wife, by deed dated May 5, 1874, in the possession of the Norfolk and Western Railway Company, and subsequently known as the Norfolk and Western Railway office building lot. F. Rorer & Son never thereafter conveyed this lot to anyone, and it stands on the records in their names to-day. The next conveyance of this lot of record is a deed from Waid and Terry to the Roanoke Land and Improvement Company, but how, if at all, they acquired title is not disclosed by the records. The chain of conveyances from Waid and Terry to the present owners is complete. With reference to this lot, the commissioner says the Norfolk and Western Railway Company is now in possession of this tract of land, and has been for a number of years, and claims the same by the most notorious acts of adverse possession, exercised by itself and those under whom it claims, as set out in its answer filed in this cause, and as shown by the agreed statement of facts filed before the commissioner, which was returned with his report. The commissioner further states that as the question of whether or not the railway company's adverse possession amounts to a good and sufficient title, is purely a question of law, he does not wish to pass upon it, but respectfully submits it to the judgment of the court.

The Norfolk and Western Railway Company filed sundry exceptions to this report, by which it is sought to set up the following defenses to the judgments asserted against the real estate claimed by it:

(1) That it had acquired title to the premises by adverse possession, and hence the land was not bound by plaintiff's judgments.

(2) That the land had been conveyed to F. Rorer & Son as a partnership, that it was acquired by the partnership, with partnership funds, for partnership purposes, and hence was personal property and not liable to plaintiffs' judgments.

(3) That prior to the rendition of any of the judgments proved in the cause, the interest of F. Rorer in the lot in controversy had been conveyed to trustees and thereby appropriated to a fund for the payment of all the debts of F. Rorer, and that he had no equity of redemption in such conveyance.

(4) That the complainants were equitably estopped from setting up their judgments against the lot in controversy.

These exceptions of the railway company were sustained by the trial court, and a decree was entered dismissing the case as to the railway company. It is from this decree that the present appeal was taken.

The briefs of counsel filed in this case have presented the case with great ability, and, though they cover upwards of six hundred pages, they have been read with pleasure. The cases cited and discussed in the briefs cannot be reviewed in an opinion of ordinary length, nor do I deem it necessary to review them, as the questions involved can be decided by the application of well established principles.

It is earnestly insisted by the railway company that it has acquired perfect title to the lot in controversy by adverse possession for the statutory period, and that it cannot be deprived of this title by being made a party to a chancery suit to enforce judgments against a defendant under whom the railway company does not claim. In fact, it denies that the railway company is either a necessary or proper party to this suit.

Disposing of the last question first, I have no doubt that the railway company is a proper party to this suit. If it ever had title by adverse possession, it did not acquire it before 1898. It claims that its predecessor in title entered upon the lot in controversy in the year 1883, and proceeded to make valuable improvements thereon. This claim could not ripen into title until the expiration of the fifteen years required by the statute. Up to the very last day before the expiration of the statutory period, there was no title by adverse possession. The title by adverse possession was acquired only upon the completion of fifteen years of adverse possession. The judgments sought to be enforced in this cause were recovered and docketed in the years 1884, 1885 and 1886. Long after that, if ever, the title of the railway company accrued, and in a suit for the enforcement of liens on the property, the railway company was certainly a proper party, if not a necessary party, as it has been held time and again that it is improper for a court to sell land until the rights of the parties in reference thereto have been ascertained and settled. This could not properly be done without making the railway company a party. *Buchanan* v. *Smith,* 115 Va. 704, 80 S. E. 794; *Woolfolk* v. *Graves,* 113 Va. 182, 69 S. E. 1039, 73 S. E. 721; *Horton* v. *Bond,* 28 Gratt. (69 Va.) 815.

The railway company invokes section 2915 of the Code for its protection. That section, so far as applicable to this case, is as follows:

"No person shall make an entry on, or bring an action to recover, any land lying east of the Alleghany mountains, but within fifteen years * * * next after the time at which the right to make such entry or bring such action shall have first accrued to himself or to some person through whom he claims * * *."

It is to be borne in mind that this is not an action to recover land, nor a suit to establish the right of entry. The

93

suit of a judgment creditor to enforce his lien against land is not a suit to recover the land itself. It would seem from a mere reading of the statute that it has no application to a case of this kind, and this was the view taken of it by this court in *Flanary* v. *Kane*, 102 Va. 547, 557, 46 S. E. 312, 681, to which further reference will be made later. Section 3567 of the Code declares that every judgment for money rendered in this State "shall be a lien on all the real estate of or to which such person is or becomes possessed or entitled at or after the date of such judgment." Section 3571 declares that the lien of this judgment may be enforced in equity, and section 3577 fixes the life of the judgment, or the time during which it may be so enforced. On the former hearing of this case in this court, it was held that the judgments here sought to be enforced were still alive and enforceable, and were not barred by the act of limitations. It would seem plain, therefore, that at the time these judgments were rendered (which were duly docketed), they were liens on whatever estate or interest F. Rorer then had in the lot in controversy which still stood upon the records in the name of F. Rorer & Son. The judgments have not been discharged, and if they were liens on this property at the time of their rendition, they are still liens thereon, unless such liens have in some way been taken away. It is claimed on behalf of the railway company that, if they were ever liens on their property, such liens have been taken away by virtue of the fact of adverse possession of the property by the railway company, and those under whom it claims, for the statutory period. It is further claimed that this adversary possession gives good title against all the world, including the judgment creditors aforesaid. It may be conceded for the purposes of this case that a title acquired by adverse possession is a perfect title, and good against all the world, but it must first be established that such title has been acquired. The statute of

limitations is generally a mere obstacle placed between a man and the enforcement of a right which he would other-wise enjoy. Remove the obstacle and ordinarily the right will revive, in the absence of statutory regulation. But when title to land has become vested by the statute of limi-tations, the repeal of the statute cannot divest a title so acquired. *Campbell* v. *Holt*, 115 U. S. 620, 6 S. Ct. 209, 29 L. Ed. 483. But even as to land, in order that the statute may *begin to run*, there must be an invasion of the rights of another. Adverse possession to constitute title must be such an invasion of the rights of another as will give that other a cause of action, and the latter must fail to insti-tute his action within the time prescribed by the statute in order to confer title on the adverse holder. In other words, he must be negligent in the enforcement of his rights. It is only as to *such persons* that the title so acquired is good, and only when the rights of *all persons* are thus barred is the title perfect. This is illustrated by many cases. Where an estate is given to A for life, with remainder in fee to B, no length of adverse possession against A can bar the rights of B, because his right has at no time been invaded. So also, where there has been a severance of the title be-tween the surface and the underlying minerals, no length of adverse possession of the surface will bar the right of the owner of the minerals. So also, where land is conveyed subject to building restrictions, no length of adverse pos-session by the occupant who does not violate the restrictions can abrogate the restrictions. This results, not because of the absence of anyone who can sue, but because *the rights of the other party have not been* invaded. *Elys* v. *Wynne*, 22 Gratt. (63 Va.) 224; *Bolling* v. *Teel*, 76 Va. 487; *Inter-state Co.* v. *Clintwood Co.*, 105 Va. 574, 54 S. E. 593; *In re Nesbit*, 2 Brit. Rul. Cas. 844, 858-860. See also *Merritt* v. *Hughes*, 36 W. Va. 356, 362, 15 S. E. 56.

The judgment creditor has no interest in the land of his

debtor. He has neither a *jus in re* nor a *jus ad rem*. He has no right to the possession. He has simply a lien upon the land, and the right to subject it to the discharge of that lien. The duration of that lien is prescribed by statute, and during the time prescribed he may enforce it in equity. The right is given in the most explicit terms, and will not be denied unless taken away by some other statute in equally explicit language. In the case in judgment, there never was a time when the judgment creditors, as such, could have made an entry upon or brought an action to recover the land. They have never claimed the land but only a lien upon it, and nothing done by the railway company has interfered with that right, or given to the judgment creditors any cause of action which they did not previously have. This was substantially held in the case of *Flanary* v. *Kane, supra.*

It is ingeniously argued, however, by counsel for the railway company that *Flanary* v. *Kane* is rested upon *Pratt* v. *Pratt*, 96 U. S. 704, 24 L. Ed. 805, which in turn is based in part, at least, upon *Coulter* v. *Philips*, 20 Pa. 154, and that in all these cases the adverse occupant claimed title under the judgment debtor, and that hence *Flanary* v. *Kane* is to be distinguished from the instant case, because the railway company does not claim under, but against, the judgment debtor. It may be conceded for the purposes of this case that *Coulter* v. *Philips, supra,* does hold that "a title paramount to the defendant, or twenty years' adverse possession by an intruder or stranger to the defendant may avail to defeat the rights and remedies of a lien creditor. A possession that would bar the debtor would divest the rights of his creditor." It is also a fact that in both *Pratt* v. *Pratt* and *Flanary* v. *Kane,* the adverse holder claimed under, and not against, the judgment debtor. The holding in *Coulter* v. *Philips, supra,* however, that a possession that would bar the debtor would divest the rights of

his creditor, is *obiter*, as no such question was involved in that case; and while *Coulter* v. *Philips* is quoted in *Pratt* v. *Pratt*, and the latter in turn is quoted in *Flanary* v. *Kane*, yet in neither instance was the quotation made for the purpose of approving the doctrine announced in the quotation made from the case of *Coulter* v. *Philips*. The quotation from *Coulter* v. *Philips* in *Pratt* v. *Pratt* is entirely consistent with the views hereinbefore expressed. That quotation is as follows:

"Lien creditors are subject to a limitation of five years; but the statute of limitations that concerns the action of ejectment has no relation to them. They have no estate in the land, no right of entry, no action to be affected by the statute. The statute bars the right of .action, and protects the occupant, not for his merit (for he has none), but for the demerit of his antagonist in delaying his action beyond the period assigned for it. *Sailor* v. *Hertzogg*, 2 Barr. 185. But what right of action has a lien creditor to delay? His only remedy is by levy and sale. He then has an estate and a right of entry. The statute may then attach; before, it cannot."

Indeed, the reasoning of Mr. Justice Miller in *Pratt* v. *Pratt* is exactly that contended for by the judgment creditors in this case. Mr. Justice Miller, among other things, says:

"The defendant, having purchased the land of the person who had the legal title, does undoubtedly hold adversely to everybody else. He admits no better right in any one. He is no man's tenant. The right by which he holds possession is superior to the right of all others. He asserts this, and he acts on it. His possession is, in this sense, adverse to the whole world. But it is not inconsistent with all this that there exists a lien on the land—a lien which does not interfere with his possession, which cannot disturb it, but which may ripen into a title superior to that under which

he holds, but which is yet in privity with it. In the just sense of the term, his possession is not adverse to this lien. There can be no adversary rights in regard to the possession under the lien, and under the defendant's purchase from the judgment debtor, until the lien is converted into a title conferring the right of possession. The defendant's possession after this is adverse to the title of plaintiff; and then, with the right of entry in plaintiff, the bar of the statute begins to run."

It will be observed Mr. Justice Miller says that the lien of the judgment creditor does not interfere with the possession of the adverse claimant, and cannot disturb it, but *this lien may ripen into a title superior to that under which the adverse claimant holds, but which is yet in privity with it,* indicating plainly that when the land is sold for the payment of the judgments, the title acquired by the purchaser will be superior to that of the adverse claimant, and that there is no adverse holding as against the judgment lien until it has become perfected into title by sale and conveyance. The purchaser at the judicial sale will take the interest of all the parties to the suit, including that of the judgment debtor, so far as necessary for the perfection of his title. It is only when the purchaser's right of entry begins that the statute begins to run against him.

In *Flanary* v. *Kane, supra,* Judge Buchanan, in referring to section 2915 of the Code, says: "The statute of limitations invoked has no application to this case." Counsel for the railway company emphasize the word "this" and seek to restrict the decision to cases where the adverse claimant holds under, and not against, the judgment debtor. This construction would seem more plausible if the opinion had closed with that sentence, but the judge goes on to say: "This is clear from the language of that statute, section 2915 of the Code, and of the statute, section 3573, which limits the time within which judgment liens may be enforced in equity."

Now, there is absolutely nothing in the language of section 2915 to justify the conclusion sought to be drawn therefrom by counsel. It makes no distinction between claimants in privity with, and those holding adversely to, the judgment debtor. There is nothing in the language of the statute which could convey the idea that the opinion intended to embrace one class of claimants, and to exclude another. Then, as if to emphasize the fact that section 2915 of the Code has no application to a suit of a judgment creditor to enforce his lien against land, the judge sets in contrast with that section 3573, of which section he says: "This implies, as has been frequently decided, that as long as the right to issue an execution, or to bring a *scire facias* or action thereon exists, the lien may be enforced in equity." In other words, that section 3573 applies to suits of this character, and not section 2915. Then, as if anticipating that some one might call for a reason for this right of the judgment creditor, he quotes from *Pratt* v. *Pratt, supra,* not for the purpose of approving directly or indirectly *Coulter* v. *Philips, supra,* but to show why the law of possessory actions cannot apply to suits to enforce judgment liens. The quotation is as follows: "The principle on which the statute of limitations is founded is the laches of the plaintiff in neglecting to assert his right. If, having the right of entry or the right of action, he fails to exercise it within the reasonable time fixed by the statute, he shall be barred forever. But this necessarily presupposes the right of entry or the right to bring suit. There can be no laches in failing to bring an action when no right of action exists."

Now, confessedly, the judgment creditor has neither the right of entry upon, nor the right to bring a suit to recover, the lands of the judgment debtor, and because he has no such right, there can be no laches in failing to bring such suit. Indeed, the holding in *Flanary* v. *Kane,* and in this

case on the former appeal, is to the effect that the equitable doctrine of laches has no application to a suit to subject lands to the lien of a judgment. So long as the creditor's judgment is kept alive, the equitable doctrine of laches will not bar his right to enforce it. He is entirely within his rights when he has docketed his judgment. He may stand by and see his debtor alien the land, or improve it many times its value, as in this case, or see the land occupied by others claiming title thereto, with no loss of his rights, unless some one else has a superior right which he is bound to respect. *Fulkerson* v. *Taylor*, 102 Va. 314, 46 S. E. 309; *Nixdorf* v. *Blount*, 111 Va. 127, 68 S. E. 258; *Flanary* v. *Kane, supra.* If it be said that the title must always reside somewhere, and that the title of Rorer was transferred to the railway company by virtue of the adverse possession, still, no matter how the transfer was made, it was made *cum onere. Parker* v. *Clarkson*, 39 W. Va. 184, 19 S. E. 431. The lien of the judgment is a vested property right, which cannot be taken away from the judgment creditor, and so long as it exists and the judgment is duly docketed, it follows the lands into the hands of whoever acquires them. *Merchants' Bank.*v. *Ballou*, 98 Va. 112, 32 S. E. 481.

For these reasons, I am of opinion that the defense of adverse possession to complainants' judgments cannot be sustained.

Although the judgments of the appellants are not barred by statute of limitations, and the adverse holder of land to which the judgments attach cannot make the defense of adverse possession against the lien of such judgments, the question still remains: To what did the lien of the judgments attach? It is well settled in this State that where the recording acts do not interfere, the judgment creditor can never subject any greater interest in the land than the judgment debtor has at the date of the judgment. *Dingus* v. *Minneapolis Imp. Co.*, 98 Va. 737, 37 S. E. 353, and cases

cited. What interest, therefore, did the judgment debtor, F. Rorer, have in the office property at the date of the judgments proven in this cause?

As hereinbefore stated, F. Rorer & Son were the fee simple owners of this property and never conveyed it to anyone, but in 1882 Waid and Terry conveyed the property to a grantee under whom the railway company-claims. The grantee entered into possession, and in 1883 commenced the erection of a large office building upon the property at an expense of about $75,000.00. In 1884, F. Rorer made a general deed of assignment to Cocke and others, trustees, to secure all of his then existing creditors, but giving preferences amongst them. By this deed he conveyed certain specific property to the trustees, and also "all other real estate situate in said city of Roanoke, Virginia, belonging to the said Ferdinand Rorer in law or in equity, in remainder or reversion, or in which he is interested as beneficiary under deeds of trust, or contracts of purchase." This deed also contains the following covenants and stipulations:

"And it is covenanted that the said F. Rorer is hereby permitted and suffered to remain in possession of the property herein conveyed until a sale hereby shall be made as hereinafter provided.

"And it is further covenanted that if the said F. Rorer shall pay off and fully discharge all of the notes, bonds and other indebtedness upon which E. G. McClanahan is endorser or surety * * * and shall pay off and discharge all indebtedness herein secured with all interest thereon, then this deed to be void and the property herein conveyed to be released at the expense of the party of the first part, otherwise the same to remain in full force and effect.

"And if the said F. Rorer shall fail to pay off all of the notes and bonds and other indebtedness upon which E. G.

McClanahan is endorser or surety and shall fail to pay the other indebtedness herein secured with the interest and cost thereon, by the 1st day of May, 1885, then upon notice to the said trustees by a majority in number of the creditors herein secured, the said trustees shall proceed to sell the property herein conveyed, or so much thereof as may be necessary at public auction at the front door of the court house of the counties in which said property is respectively situated * * * But it is expressly covenanted that in no event shall any property be advertised or any such sale be made at public auction until the 1st day of May, 1885, and then only one-third of the property conveyed shall be sold at that time unless otherwise agreed upon by the parties of the first and second part.

"The remainder of the said property to be sold as follows, to-wit: one-third to be sold on the first day of May, 1886, and the remaining one-third on the first day of May, 1887, unless otherwise agreed upon by the said parties * * * And it is covenanted and agreed that the said F. Rorer is permitted to make sale of any of the property herein conveyed either for cash or for reasonable credit, subject to confirmation by said trustees."

In the following year, 1885, some of the creditors secured filed a bill to set aside this deed on the ground of fraud and inconsistent reservations on the part of the grantor. The bill, however, contained the alternative prayer that, if the deed should be upheld, the court would take charge of the property conveyed and administer the trust. In the meantime, in the years 1884, 1885 and 1886, the appellants who were secured by said deed proceeded to reduce their claims to judgment, which judgments were duly docketed. Such proceedings where had in the above mentioned suit that a number of pieces of property were sold and the proceeds brought into the court and by its orders distributed to the parties entitled thereto. The court referred the case to a

commissioner to take an account of the debts and their priorities, and also an account of the real property conveyed by the deed. This account was taken and duly confirmed by the court, but no mention is anywhere made of this office property. This case continued on the docket until 1898, when, after having administered all the assets that came into the hands of the court, the court dismissed it from the docket under the five-year rule.

In 1906 the present suit was instituted but no reference was made to this office property in the bill, nor was the railway company made a party defendant until 1912, when it was suggested in the answer of one of the defendants to this suit that the railway company was in possession of property formerly belonging to Rorer, and which had never been conveyed by him. Thereupon, the complainants amended their bill by bringing the railway company into the suit, and asserted a lien on this office property. This was about thirty years after the deed made by Waid and Terry to the predecessor in title of the railway company.

Among other defenses relied upon by the railway company was that of adverse possession, one feature of which we have already discussed. It is not claimed by the appellants that the office property in controversy did not pass by the deed of trust aforesaid, but their claim is that the deed of trust was but a conveyance to secure creditors with the right of redemption in the grantor, and that their judgments constitute liens on the defendant's equity of redemption.

It is insisted, however, that there was no equity of redemption in the office property because (1) the deed of trust parted with all interests that Rorer had in the property and created a trust fund out of which his debts were to be paid, and (2) that if he had any equity of redemption it was what remained after discharging the debts secured by the deed of trust, and that, as the debts evi-

denced by the judgments of the appellants were secured by the deed of trust, the payment of the debts would *ipso facto* discharge the judgments, and hence there was nothing left in Rorer in the way of an equity of redemption which could be subjected to the payment of the judgments.

Whether or not the deed amounted to an assignment creating such trust fund, or was merely a mortgage, is in a large measure a question of intention to be determined from the language of the instrument itself. *Hoffman* v. *Mackall,* 5 Ohio St. 124, 131. Without going into detail on this subject, I may say that the powers reserved by Rorer in the deed, the provision for the avoidance of the deed upon the payment of the debts, and the limit upon the powers conferred to sell only so much of the property as might be necessary, and various other provisions thereof, lead me to the conclusion that the deed was intended as a deed of trust to secure debts, and was not an assignment.

Assuming that the office property passed under the deed of trust to Cocke and others, trustees—and the case has been argued upon that assumption by counsel on both sides—and that the railway company acquired title by adverse possession as against said deed of trust, what rights, if any, have the appellants by virtue of their judgments? After the recovery of the judgments, appellants had two securities for their debts, one the deed of trust aforesaid, which was a specific lien on the property therein conveyed, and the other their judgments, which were general liens on the real estate of the judgment debtor. These judgments constituted liens on whatever interest Rorer had in the property. It is insisted that Rorer's interest in the property consisted of a mere equity of redemption in the property, and that the discharge of the debts secured automatically discharged the judgments which had been recovered on these debts. The debts secured by the deed were not paid nor released, nor were they, in any true sense of

the term, discharged. The security furnished by the deed of trust was simply barred by the act of limitation. That is all. The security furnished by the judgments, however, is not barred, and may still be enforced if there is anything upon which it can operate. As the deed of trust was a mere security for the debts therein mentioned, it is clear that F. Rorer had an equity of redemption in the property conveyed, and as long ago as 1737 Lord Hardwicke laid down the doctrine, now well established, that an equity of redemption in real property is *an estate in the land*, and our statute declares that a judgment shall be a lien "on all the real estate of or to which such person is or becomes possessed, or entitled at or after the date of such judgment." Code, section 3567. That a judgment is a lien on an equity of redemption, was held by this court in *Michaux* v. *Brown*, 10 Gratt. (51 Va.) 612; *Hale* v. *Horne*, 21 Gratt. (62 Va.) 112.

Prior to the execution of this deed of trust, Rorer stood upon the record as the fee simple owner of this property, and after its execution he was still the fee simple owner, subject to the encumbrance created by the deed of trust. Whether this encumbrance were removed by the payment of the debts secured, their release, or discharge by act of limitation, or otherwise, is immaterial. If it was actually removed, the property belonged to Rorer discharged of the encumbrance of the deed.

It was necessary for the deed to be accepted by the beneficiaries in order to be effectual. If all of the parties secured repudiated the deed and refused to accept the security provided thereby, Rorer was powerless to force the deed upon them, and they could assert their rights in any way they pleased, and in the instant case, if they had refused to accept the provisions of the deed, the judgments of appellants, which had already attached, could have been enforced at once against the property, discharged of all liability on

account of the deed. If the limitation to the enforcement of the deed were five years and the appellants chose to let that time elapse so that they could no longer enforce the deed, they could still enforce the lien of their judgment which had already attached to the property. The situation is the same, whether the limitation were five years or twenty. That period having expired, the lien of the judgments which had attached to the property could be enforced. These liens attached, not at the expiration of the period of limitation, but at the date of the recovery of the judgments. From the recovery of the judgments they have been liens on the property until the present time, subject, however, to the prior lien created by the deed of trust, and although this prior lien has become barred by the act of limitations, that does not affect the lien of the judgments. The prior lien has simply ceased to exist. The obstacle placed between the appellants and the right to enforce their judgment against the property has simply been removed, and the right which has existed from the date of the judgments may now be enforced. It often occurs that the evidence of a debt is barred by the act of limitation, but the debt is secured by a pledge or mortgage, and it has been repeatedly held that, although the evidence of the debt may be barred by the act of limitations the pledge or mortgage may be enforced. *United Cigarette M. Co.* v. *Brown,* 119 Va. 813, 89 S. E. 850; *Bowie* v. *Poor Soc.,* 75 Va. 300; *Tunstall* v. *Withers,* 86 Va. 892, 11 S. E. 565; *Roots* v. *Salt Co.,* 27 W. Va. 483; 1 Va. L. Reg. 854. The same principle applies in the instant case, where the creditors held the general lien of their judgments and the specific lien of the deed of trust. The deed of trust cannot be enforced, but the lien of the judgments which has been kept alive may be. Hence, although the defense of the statute of limitations may be good as against the claim under the deed of trust, it is not good or available against the judg-

ments, and the appellants have the right to enforce said judgments against the office property.

The fact that this piece of property was not discovered while the suit was pending to enforce the deed of trust to Cocke and others, trustees, and hence was not subjected to said deed in that suit, is no bar to the present suit to enforce said judgments. A lien creditors' bill may be filed to subject land to the payment of the judgment liens thereon, and there may be ordered and taken an account of the liens and of the property liable therefor, and it may be subjected to such liens and the case be dismissed from the docket, but this is no bar to a subsequent suit by the same, or other creditors, to subject other lands of the judgment debtor, not discovered during the pendency of the first suit, to the lien of their judgments, if they are still alive. *Callaway* v. *Saunders*, 99 Va. 350, 38 S. E. 182. By analogy it would seem clear that the present suit may be maintained as the judgments are alive and unsatisfied.

The lien of the judgments attached, by force of the statute, at the dates of the judgments, and the complainants are entitled to have enforced in their favor the rights acquired *as of those dates*. They are not here as a matter of grace, but of right. They are in no way appealing to the conscience of the court. One section of the statute gives the lien, and another declares that "jurisdiction to enforce the lien of a judgment shall be in equity." Code, sections 3567 and 3571. The court can impose no conditions, and the equitable doctrine of laches has no application to the case. As the judgments are still alive, as they attached to this piece of property, as they have not been discharged or released, I see no relief that can be extended to the present owners, though the silence of the creditors and their delay in the enforcement of their liens and the resulting disaster to the present owners is such that if the court had any discretion whatever in the premises, it would not

entertain them for a moment. It is a case in which the courts are unable to afford any relief, but which appeals very strongly to the legislative branch of the government.

The railway company further defends on the ground that the property was purchased with partnership funds for partnership purposes, and is therefore personal property and not bound by appellants' judgments. No evidence of this is offered except the deed itself and the presumption arising from it. On the other hand, it is shown by P. H. Rorer that his interest in the property was purchased with his own funds, and that none of the partnership assets went into it; that the partnership has been settled many years ago, and all the partnership assets divided. Objection, however, is made by the railway company to the testimony of P. H. Rorer on the ground that he is incompetent to testify on account of interest. P. H. Rorer was a member of the firm of F. Rorer & Son, and is a party to this suit and interested in the results as the owner of some of the judgments proven. Section 3345 of the Code removes the disqualification of interest. This section, however, is qualified by section 3346, which declares that where one of the original parties to the transaction which is the subject of investigation is dead or otherwise incapable of testifying, the other party to the transaction shall not be admitted to testify in his own favor or in favor of any other person whose interest is adverse to that of the party so incapable of testifying, except under certain conditions. The transaction which is the subject of investigation is the deed made by John Trout to F. Rorer & Son. All of the parties to this transaction are dead except P. H. Rorer. Trout, the grantor in the deed, has no manner of interest in the question involved, and it is immaterial to those claiming under him whether the property conveyed is declared to be either real or personal property. Nothing that the witness can say can affect him or those who claim under him in any way.

There are no creditors of the firm of F. Rorer & Son making any complaint or objecting to the testimony, nor is any objection raised by the personal representative of F. Rorer, who is a party to the suit. The testimony offered is not only not adverse to any one claiming under F. Rorer, but, on the contrary, subsequent alienees of F. Rorer unite with the creditors in seeking to hold property of the railway company liable for appellants' judgments. The witness is not offered to prove any fact that is adverse to the interest of either John Trout or F. Rorer or any person claiming under either. The only objection to the testimony of the witness comes from the railway company, which is a third party having no connection whatever with the conveyance from Trout to Rorer & Son, but which, on the contrary, is claiming adversely to Rorer and those who claim under him. As the witness is rendered generally competent by section 3345 of the Code, the objection to his testimony on account of qualifications made by section 3346 must come from some party who is interested in the transaction which is the subject of the investigation. The railway company has no manner of interest in or claim under the deed from John Trout to F. Rorer & Son, which is the transaction under investigation, and hence an exception from that source is not valid. According to the testimony of P. H. Rorer, he and his father were joint tenants of the property and F. Rorer's interest therein is liable to appellants' judgments.

The railway company also sets up the defense of equitable estoppel against appellants' judgments. The only ground of estoppel alleged is that F. Rorer said to the surveyor while plotting this property for the Roanoke Land and Improvement Company, and before it purchased, that he owned no land east of Commerce street, which statement would exclude his ownership of the property in controversy, and notwithstanding this he saw valuable improvements

95

being erected on the property and made no assertion of any claim thereto. It further relies upon the fact that McClanahan's administrator, one of the appellants, is now asserting claims then existing against this property, and that McClanahan also lived in Roanoke and was silent as to any claim to the property. It is true that the engineer who made the survey testifies that he spoke to Mr. Rorer at one time and expressed regret at the fact that he did not own any property down at this end of town, so that he could receive some benefit from the improvements that would be made there, and that Rorer told him he did not own any property on the east side of Commerce street. This statement was made apparently in a most casual conversation, and there is no intimation that it was ever communicated to the proposed purchaser of the property, or that it in any way influenced or affected the purchase. The doctrine of equitable estoppel is based upon some act of the party to be estopped upon which the party pleading the estoppel had the right to rely, and did in fact rely, to his prejudice. The evidence fails to show that the railway company or any of its predecessors in title ever relied to their prejudice on anything that was said or done by F. Rorer or P. H. Rorer or E. G. McClanahan, or upon any failure on their part to do anything they ought to have done. For these reasons I think that the appellants are not estopped from asserting their judgments against the property of the railway company.

The appellants also claim that the property known in the record as the "Commerce street school property" is liable to the lien of their judgments. The school board of the city of Roanoke make several defenses to this claim, the chief of which is that their predecessors acquired title under a parol contract of purchase, under which they had acquired a perfect equitable title prior to the rendition of any of the judgments mentioned in appellants' bill. *Floyd* v. *Hard-*

*ing*, 28 Gratt. (69 Va.) 401. The purchase was made by the trustees of Big Lick school district, in Roanoke county, which afterwards became incorporated as a part of the city of Roanoke. The property thus passed by operation of law to the school board of the city of Roanoke. The circumstances leading up to and attending the purchase were as follows: In 1876 the school board of Big Lick district in Roanoke county desired to establish a graded school, but did not have the means to do so. F. Rorer owned a lot which they desired to acquire, and which he offered to them upon the following terms: "For $2,500, and take the school house and lot on the hill at $500 in part payment, and the residue in equal payments in one and two years, with interest from date at six per cent. per annum." They canvassed the town of Big Lick for private subscriptions, and obtained good solvent subscribers to the amount of $1,220. The board then accepted Rorer's proposition and issued its bonds for $800, which, together with the house and lot on the hill and the private subscriptions, made up the price agreed. The school trustees took possession of the property thus purchased and a few years thereafter expended $2,000 in adapting it to school purposes. They appear also to have delivered possession of the house and lot on the hill to Rorer. The bonds do not on their face refer to the contract in pursuance of which they were given nor to the minutes of the board, but each of them states that it is for "payment on house and lot bought of F. Rorer for school purposes," and each bears an endorsement dated December 20, 1876, as follows: "For value received I assign the within bond to John B. Harding with permission to indulge until notified in writing to collect. (Signed) F. Rorer." No deed was made by Rorer to the trustees nor by the trustees to Rorer, but the bonds given by the trustees for the deferred payments were paid, and some, if not all, of the private subscriptions were collected and paid over to Rorer.

In the petition for the appeal it is insisted that the assignment of the bonds and warrants to John B. Harding by F. Rorer, signed by the latter, constitutes a contract in writing between F. Rorer and the school board. The appellants' views are presented as follows: "The bonds and warrants were all payable to Rorer, the vendor, and endorsed by him with his signature. All refer to the property purchased of Rorer for school purposes, and purport to have been executed pursuant to a resolution of the board of trustees, in which resolution, it will be remembered, is set out the full terms of the contract of purchase. Together, then, these papers contain a clear, certain memorandum in writing, signed by the party to be charged, and, in themselves, constitute a contract in writing."

These assignments were for the purpose of transferring choses in action from F. Rorer to Harding, and with no purpose of creating or evidencing a contract with the school board which was not a party to them. The signatures of Rorer were made *diverso intuito*, and together with the warrants and bonds upon which they are made do not constitute a contract in writing between Rorer and the school board, within the meaning of our recording acts. *Sutherland* v. *Munsey*, 119 Va. 791, 89 S. E. 882; *Brown* v. *Butler*, 87 Va. 621, 13 S. E. 71; Code, sec. 2465.

There has been much discussion in this case as to who has the burden of showing that the contract was by parol, but, assuming that the burden of proof is upon the trustees, I concur with Commissioner Stuart in his finding that the evidence shows that the contract was a parol one. It is true that the law favors written evidence of such contracts, and in doubtful cases will presume that the contract was in writing. *McLin* v. *Richmond*, 114 Va. 244, 76 S. E. 301; *Dickenson* v. *Ramsey*, 115 Va. 521, 79 S. E. 1025. It is also true that the statute relating to this class of property requires that the contract shall be in writing, and that the

evidence of title shall be approved by the circuit court, or judge thereof in vacation. Where, however, the rights of parties are made apparent on the public records, and they have allowed upwards of thirty years to elapse before they have made any investigation of the records to ascertain their rights, and the beneficiaries of the property are represented by trustees who are public officers receiving but little, if any, compensation for their services, and where, after the lapse of many years, all of the parties representing the public interest have died, and the loss of other evidence may have been sustained as incident to the change in office of the trustees, it is not to be expected that those representing the public interest will be able to establish the rights of their beneficiaries by that clear and satisfactory evidence which might be expected and demanded of a private individual looking after his own interest.

It appears from the agreed statement of counsel that a large number of the papers belonging to the school board were found among the effects of Mr. Kefauver, the former clerk of the board. The papers so found represented in large measure vouchers of one kind and another, deeds which had been recorded, and some which had not been recorded, and other papers pertaining to the school affairs. The condition in which the papers were found would seem to indicate that Kefauver had been careful and particular in preserving the papers placed in his custody. It was among these papers that there were found the subscription lists of citizens, the bonds executed for deferred payments on the school house and lot, and various warrants, stub books, etc., and yet no written contract was found among these papers. The records do not show that the assent of the circuit court, or the judge thereof, to the title was ever entered of record, or that he refused to approve the title. No contract was found recorded. No title bond was found of record, nor among Rorer's papers, though it was testi-

fied by P. H. Rorer that he kept copies of such bonds. In addition to this, the testimony of Ballard, the county superintendent, to the effect that he was careful to have recorded all the contracts and deeds made to the school board, and that he had no recollection of any such contract in writing made by the school board of Big Lick, and other statements by Ballard, all go to confirm the view that the contract was by parol. In addition to this, it would seem from the minutes of the board that Mr. Rorer appeared before the board and made his proposition orally and not in writing, and that the proposition thus made was accepted by resolution of the board. The evidence on this subject as to the nature of the contract was as satisfactory as could be expected under the circumstances of this case, and I think shows that the contract was by parol, and not in writing.

Exception was taken to the introduction of the records of the board, but these records are books of original entry introduced to show the acts of the board with reference to this property, and I think were entirely admissible for that purpose.

It has been argued that the recital in the bond payable eighteen months after date, that it is the "last deferred payment on the school house property," is conclusive of the fact of complete payment of all the purchase money. The recital was at most only *prima facie* evidence of the facts stated, and the evidence in the cause fully meets and repels the *prima facie* presumption that would otherwise arise from the possession of the bond with the endorsement of payment.

The evidence raises a very strong presumption that Rorer was paid in full for the property before any of appellants' judgments were recovered, but this is not sufficient. *Gordon* v. *Rixey*, 76 Va. 694, 697; *Ackerman* v. *Fisher*. 57 Pa. 457.

Without going into the evidence in detail, although I have given it a most careful and critical examination, it is

sufficient to say that I do not think it shows with the necessary certainty the payment in full to Rorer of the whole of the purchase money agreed to be paid to him for the school house lot, and for this reason it does not appear that the trustees acquired a complete equitable title before the appellants' judgments were obtained.

In 1876 when this purchase was made, however, there was in force an act of assembly relating to the purchase of land by school boards, which is as follows:

"Be it enacted by the General Assembly of Virginia, That whenever it shall be necessary for any county, city, overseers of the poor, district school trustees, or other public officers to purchase real estate, or acquire title to any property for public uses, the contract therefor must be in writing, and the evidence of title must be submitted to the county court, or to the judge thereof, in vacation, for confirmation and approval, which confirmation or approval must be entered of record by the clerk of the court. And no contract shall be valid until the title to such real estate is thus approved or confirmed; and if said court or judge refuse to confirm or approve the same, the disapproval shall also be recorded.

"2. The supervisors of the county or corporate authorities of any city or town, or any five citizens may, by motion, appeal, of right, from the decision of the county court or judge thereof, to the circuit court, where the appeal shall be tried without pleadings, and be decided on the merits of the case." (Acts 1874-5, p. 190.)

It is insisted with great earnestness and ability by the learned counsel for the complainants, that as this contract was not in writing and as the evidence of the title was not submitted to the court or judge, as required by the act, the school board was not bound by it, and hence there was a lack of mutuality of right and obligation, and that, where this is lacking when the contract is entered into, no sub-

sequent act or omission of the parties can supply its place. It must be borne in mind that this is not a suit upon that contract, nor for its enforcement. The school board acquired the equitable title to the property thirty years before this suit was brought, and the legal title at least five years before they were made parties thereto. They are in possession with both the legal and equitable title and all they ask is to be let alone. The judgments of the complainants, if they attached at all to the property, attached as of their date, and they claim that they did so attach, and they are seeking in this suit to enforce those liens. It is necessary, therefore, to consider the effect of the statute. It is manifest from the language of the statute that it was not enacted for the benefit of vendors of land, but to prevent the loss of public funds by investment in property the title to which was defective. It is true that it declares that the contract shall not be valid unless and until the title to the land "be thus approved," but this does not necessarily mean that the contract shall be void. The Massachusetts statute of frauds contains language very similar to the statute under consideration. It declares that contracts within the statute shall not be held to be "good and valid" unless they are in writing, and, in construing this statute the court held that it was not the intention of the legislature to declare such contracts void, but simply to prevent oral proof. *Townsend* v. *Hargraves*, 118 Mass. 325. The relation of the parties to this contract is strongly assimilated to the relation of parties to a contract within the statute of frauds which has been signed by only one of them. There is no lack of mutuality in the contract, but in the formality of the evidence of it. The school board had full power to buy the lot for the school house, the county school board approved the sale to Rorer of the lot on the hill, and the agreement with Rorer possessed every element of a valid contract save the failure to comply with the statute enacted for its bene-.

fit. The statute, like the statute of frauds, does not go to the existence of the contract, but makes written evidence necessary to evidence it. Moreover, like the statute of frauds, the right to demand compliance with the statute is a matter personal to the parties to the contract and their privies, and cannot be insisted upon by third persons. Clark on Contracts (2d ed.), pp. 91, 96; *Cahill* v. *Bigelow,* 18 Pick. (Mass.) 369; *Glenn* v. *Rogers,* 3 Md. 312; Brown on Stat. Frauds, secs. 128, 135.

The lack of mutuality in the obligation of a contract, growing out of the failure of one of the parties to a contract within the statute of frauds to sign it, is no objection to the binding effect of the contract. It is one of the well defined exceptions to the general rule requiring mutuality. In Pomeroy on Contracts, sec. 170, it is said: "The second general exception to the requirement of mutuality includes all those agreements which, by the provision of the statute of frauds, must be in writing, and which, in conformity with the overwhelming weight of judicial authority, need only to be signed by the party to be charged, that is, by the defendant in the suit brought upon the contract."

In *Central Land Co.* v. *Johnston,* 95 Va. 223, 28 S. E. 175, it was held that specific performance of a contract for the sale of real estate will be decreed against the party who signed the contract, although the other party did not sign, and there was no mutuality of remedies between the parties at the time the contract was made. The filing of the bill by the other party for specific performance makes the remedy and the obligation of the contract mutual.

As parol contracts for the sale of land were valid in 1876, by parity of reasoning to cases arising under the statute of frauds, the fact that the contract was not in writing and the title to the land was not approved by the court or judge, furnishes no valid reason why the contract may not be enforced, in a proper case, against Rorer, who labored under no disability to contract.

96

The situation was as follows: Rorer and the school board had entered into a parol contract in September, 1876, for the exchange of property. Under the terms of the exchange Rorer was to take the "lot on the hill" at $500; the school board were to have the "grove" property and were to pay Rorer $2,000 additional, of which $800 was to be paid by warrants out of school funds, and $1,200 out of funds raised by subscriptions from the citizens. Rorer had received possession of the "lot on the hill" and as far back as 1882 this lot had been conveyed by John Trout to a purchaser. The school trustees had paid the $800 and certainly a considerable amount of that subscribed by the citizens. The "grove" property had been changed from a residence into a school house, and $2,000 had been expended in making the change. After this, the complainants obtained their judgments. The agreement between the parties was certain and definite in its terms. The acts done in part performance of the contract referred to, resulted from, and were done in pursuance of the agreement, and the agreement itself had been so far executed that a refusal of full execution would have operated a fraud upon the trustees and placed them in a situation which does not lie in compensation. The contract for this exchange of property was fair in every respect, but being by parol, it could not be recorded. The trustees were in no default except perhaps they owed a balance of the purchase money. It was impossible, if the contract had been rescinded, for the parties to be placed *in statu quo ante.* The "lot on the hill" which was received by Rorer had been sold and conveyed to a third party. The school property had been utterly changed, and the situation was such that, if the contract was valid and enforceable, upon tender of the balance due to Rorer, if any, a court of equity would have compelled him to make a deed, and he, on his part, had acquired a complete equitable title to the "lot on the hill." If the contract was valid each party was in a position to de-

mand specific performance—Rorer without condition; the school trustees on tender of the balance due, if any. Such was the situation of the parties before the rights of the creditors intervened. The rights of the parties to this contract were plainly established, and third persons could not thereafter come in and disturb the rights thus vested.

The oldest judgment proven in the cause was recovered in 1884, eight years after the sale to the school trustees, and after the happening of the events hereinbefore detailed. From that time till 1911 not one step was taken by these creditors to subject this property to the payment of their judgments. The judgments had apparently become barred by the statute of limitations, but were kept alive, not by the diligence of the creditors, but by the accidental circumstance that Rorer left the State and continued to reside out of the State until 1906, when he died. In the meantime, the property had been improved by the erection thereon of a school building costing upwards of $20,000, and the land had otherwise greatly enhanced in value. Rorer, also, in pursuance of the legal and moral obligation resting upon him, had conveyed the legal title of the property to the school board. All of this transpired before this suit was brought, and not until five years after it was brought were the trustees made parties defendant to this suit. In order to defeat these rights and equities of the school board, the complainants invoke the statute aforesaid, to show a want of mutuality in the contract and a consequent right on their part to subject the property in its present state to the payment of their judgments. To permit them to do so would be to perpetrate a fraud upon the trustees, and to turn a statute which was intended as a shield to protect the improvident expenditure of public funds into a sword of offense. I cannot assent to that proposition. As I have heretofore stated that I did not think that the evidence showed with the necessary clearness required by law, that

the whole of the purchase money had been paid at the time complainants' judgments were recovered, it remains to be considered "to what extent, if at all, can appellants subject said property?"

It has been earnestly insisted by counsel for the school board that equity considers that as done which ought to have been done, and that immediately upon the execution of a valid contract for the sale of land, the purchaser is considered in equity as the owner of the land and the vendor the owner of the purchase money, and hence complainants' judgments never attached to this property, as the contract was entered into before any of their judgments were recovered. Many authorities are cited to support the doctrine of equitable conversion, but none which are applicable to a case of this kind. The judgments are statutory, legal liens and attach to the legal ownership of the land, but equity limits the liability to the extent of the beneficial interest of such owner. At the time of the recovery of the judgments Rorer was at law the fee simple owner of the property, and to this the lien of the judgments attached, but, in consequence of the contract of sale, equity will restrict the lien creditors in the enforcement of their liens to the amount owing by the school board to Rorer, at the date of the recovery of the judgments.

In *Borst* v. *Nalle*, 28 Gratt. (69 Va.) at page 433, it is said: "Authorities without number might be cited to show that where statutory enactments do not interfere, the creditor can never get by his judgment more than his debtor really owns, and to this he will be confined, as he should be, by courts of equity. In support of this proposition the following apposite authorities are cited by the appellant's counsel. *White* v. *Carpenter*, 2 Paige (N. Y.) 217, 238, 266-7; *Keirsted* v. *Avery*, 4 Paige (N. Y.) 9; *Buchan* v. *Sumner*, 2 Barb. Ch. (N. Y.) 165, 207; *Lownsbury* v. *Purdy*, 11 Barb. (N. Y.) 490; *Towsley* v. *McDonald*, 32

Barb. (N. Y.) 604; *Sieman* v. *Austin,* 33 Barb. (N. Y.) 9; *Siemon* v. *Schurck,* 29 N. Y. 598; *Smith* v. *Gage,* 41 Barb. (N. Y.) 60, 71-75; *Schlaeper* v. *Corson,* 52 Barb. (N. Y.) 510; *Robinson* v. *Robinson,* 22 Iowa 427; *Thomas* v. *Kennedy,* 24 Iowa 397; *Brown* v. *Pierce,* 7 Wall. (U. S.) 205, 213, 19 L. Ed. 134; *Baker* v. *Morton,* 12 Wall. (U. S.) 150, 20 L. Ed. 262.

Many cases have been since decided in this and other courts holding the same proposition. Indeed, it cannot be gainsaid. One of the latest in this State is *Straley* v. *Esser,* 117 Va. 135, 83 S. E. 1075.

Furthermore, it is the beneficial interest and only the beneficial interest of the judgment debtor that his creditor can subject. *Straley* v. *Esser, supra.* As there are no statutory provisions to interfere in this case, the creditor is in a sense substituted to the rights of his judgment debtor, and cannot subject the property standing in the name of the judgment debtor to any greater extent than is measured by the beneficial interest of the debtor in the property. It is true the debtor holds the legal title to the land, but he holds it in trust for the benefit of the purchaser to be conveyed to him upon payment of the balance of the purchase money, and upon tender or payment of that amount he would be compelled to convey the legal title. The balance due on the purchase price is the measure of the debtor's beneficial interest in the property, and such is the measure and extent to which the judgment creditor can subject it.

I am not unmindful of the fact that this holding is in conflict with the conclusion reached by this court in *Fulkerson* v. *Taylor,* 102 Va. 314, 46 S. E. 309. That case was decided by a court of very able judges, and the opinion was delivered by one of the most distinguished judges who ever sat upon this bench. But the reasons upon which the conclusion was reached are not stated in the opinion. In the opinion it is said: "If it be true, as insisted by counsel for

Wheeler's heirs, that his contract of purchase from Fulkerson was in parol; that Wheeler had been put in possession under it, and paid part of the purchase price before the Baylor judgment was rendered and docketed—it does not, to the extent of such payment, give them priority over the lien of the Baylor judgment. In order for a purchaser, under a contract which is not required to be recorded, to be protected as to subsequent judgments against his vendor, he must, before the date of such judgment, have become invested with a perfect equitable title. *Withers* v. *Carter,* 4 Gratt. (45 Va.) 407, 412, 50 Am. Dec. 78; *Floyd, etc.* v. *Harding,* 28 Gratt. (69 Va.) 401, 414, 416; *March, Price & Co.* v. *Chambers,* 30 Gratt. (71 Va.) 299, at page 303; *Long* v. *Hagerstown Agricultural Co.,* 30 Gratt. (71 Va.) 665; *Brown* v. *Butler,* 87 Va. 621, 13 S. E. 71; *Powell* v. *Bell's Adm'r,* 81 Va. 222. Wheeler did not have at that time a perfect equitable title, as he had only paid a part of the purchase price."

All of the cases cited belong to one or the other of two classes. Either there was a valid contract which had been completely performed and the purchaser was entitled to call for a deed, or else there was a written contract which the statute declared void because it was not recorded. In the first class the property was held not liable to judgments against the vendor. In the second class, the property was held liable. In *Withers* v. *Carter, supra,* there was a written contract, but, as the law then stood, it was valid, though not recorded. The purchaser, however, had fully complied with his contract and was entitled to call for a deed, though he still owed a balance of the purchase money. This balance, at his instance, was subjected to the payment of the judgments against his vendor. I do not think that it follows as a logical deduction that because there is no liability on the land when the equitable title of the purchaser is complete, the whole land, with all the improvements put there-

on, is liable when the equitable title of the purchaser is incomplete. On the contrary, it would seem that, upon like reasoning, if the equitable title were not complete, the creditors of the vendor would still be restricted to the rights or interest of the vendor in the land, and that they could only subject it *pro tanto*. If the creditor can get nothing when all of the purchase money has been paid, it would seem that when only a part has been paid and the parties cannot be placed *in statu quo ante,* the creditor should be restricted to the interest of the debtor represented by what was due to him and which was secured by a lien on the land. The creditor ought not to be allowed to acquire any higher or greater rights than the debtor himself has, and such seems to be the result of the authorities. Where a valid contract for the sale of land has been entered into, and the recording acts do not interfere, a judgment against the vendor after the contract and before deed to the purchaser, and before the entire purchase money has been paid, is a lien on the land only to the extent of the purchase money then unpaid. This, we think, is a fair deduction from *Withers* v. *Carter, supra; Floyd* v. *Harding, supra,* and *Borst* v. *Nalle, supra.* In *Bowman* v. *Hicks,* 80 Va. 806, possession was taken under a valid parol contract, but *only a part of the purchase money* had been paid, when a judgment creditor of the vendor sought to subject the land to the payment of his judgment. It was held that he could not subject the land "except to the payment of the unpaid purchase money."

In West Virginia, whose laws are like our own, Judge Green whose opinions are always luminous, in discussing this subject in *Snyder* v. *Martin,* 17 W. Va. 276, at p. 298, says: "The principal question presented by this record is, whether a parol contract, so far executed as to entitle the purchaser to a specific execution of the contract, is good against a subsequent judgment creditor. Independent of any statute law, the lien of a judgment is a charge upon

the precise interest which the judgment debtor has, and upon no other. The apparent interest of the debtor can neither extend nor restrict the operation of the lien, so that it shall encumber any greater or less interest than the debtor *in fact* possesses. The judgment creditor has a charge on the interests of the defendant in the land, just as they stood at the moment the lien attached, therefore though he seems to have an interest, yet if he have none in fact, no lien can attach. The rights of the judgment lien owner cannot exceed those which he might acquire by a purchase from the defendant with full notice of all existing legal or equitable rights belonging to third persons. The attaching of a judgment lien upon the legal title forms no impediment to the assertion of all equities previously existing over the property. The judgment lien is in equity but a charge on the equity held by the defendant, where the lien attaches. It can only hold the legal estate subject to the equity. It is well settled that a judgment lien on the land of the debtor is subject to every equity which existed against the debtor at the rendition of the judgment; and courts of equity will always limit the lien to the actual interest of the judgment debtor. The lien of the judgment creates a preference over subsequently acquired rights, but a court of equity will always protect the equitable rights of third persons existing at the time the judgment lien attached. See Freeman on Judgments, pp. 309, 310 and 311, secs. 356, 357; *Churchill* v. *Morse*, 23 Ia. 229, 92 Am. Dec. 422; *O'Rourke* v. *O'Conner*, 30 Cal. 442; *Coster's Ex'r* v. *Bank of Georgia*, 24 Ala. 37, 64; *Walke* v. *Moody*, 65 N. C. 599; *Ells* v. *Tousley*, 1 Paige (N. Y.) 280; *Morris* v. *Mowatt*, 2 Paige (N. Y.) 586, 22 Am. Dec. 661; *Brown* v. *Pierce*, 7 Wall. (U. S.) 205, 19 L. Ed. 134."

After giving numerous illustrations, he proceeds: "It may therefore, be laid down as a universal rule established by many cases, that a judgment lien is always subject to

every possible description of equity held by a third party against the debtor at the time the judgment lien attached; and that it is immaterial, whether the rights of such third party consist of an equitable estate or interest in the judgment debtor's land, an equitable lien on his land, or a mere equity against the debtor which attaches to or affects his land. Nor is it at all material whether the judgment debtor has or has not, when he contracted his debt or obtained his judgment or docketed the same, notice of such equitable estate, equitable lien, or mere equity. If they be prior in time to the judgment, they will always be preferred to the judgment lien. The authorities we have cited abundantly sustain this conclusion; and there is no exception to this universal rule, except where such exception has been made by some statute law.

"Unquestionably, therefore, a purchaser of land by parol contract, to the full extent that a court of equity would recognize his equity against the party who by parol contract had agreed to sell him the land, should be held in a court of equity to have rights superior to any subsequent judgment creditor, whether the judgment creditor had or had not notice of his contract to purchase the land, unless some statute law has rendered the judgment creditor's lien superior to his equity."

In *Filley* v. *Duncan*, 1 Neb. 134, 93 Am. Dec. 337, it is said to be "well settled that in equity the lien of a judgment is subject to all equities that existed at the time it was recovered;" and in *Dalrymple* v. *Security Company*, 11 N. D. 65, 88 N. W. 1033, 1036, it is said to be well settled "that the lien of a judgment attaching to real estate after a contract of sale extends only to the interests of the vendor, and is entirely subject to the contract of sale."

In *Hays* v. *Reger*, 102 Ind. 524, 1 N. E. 386, it is said: "The interest which the lien of a judgment affects is the actual interest which the debtor has in the property, and

97

a court of equity will always permit the real owner to show (there being no intervening fraud) that the apparent ownership of another is or is not real, and when the judgment debtor has no other interest except the naked legal title, the lien of a judgment does not attach."

To the same effect see *Straley* v. *Esser, supra.*

In *Wells* v. *Baldwin,* 28 Minn. 408, 410, 10 N. W. 427, speaking of the purchaser at a sheriff's sale under a judgment, it is said: "In other words, the purchaser at such sale would be entitled to the same rights as the vendor in the contract had, and would be compelled to make a conveyance to the vendee upon precisely the same terms upon which the vendor could have been compelled to convey."

To the same effect see *Hampson* v. *Edelen,* 2 Har. & J. (Md.) 64, 3 Am. Dec. 530; *Woodward* v. *Dean,* 46 Ia. 499; *Berryhill* v. *Potter,* 42 Minn. 279, 44 N. W. 251; *McMullen* v. *Wenner,* 16 Serg. & R. (Pa.) 18, 16 Am. Dec. 543, 546; *Minns* v. *Morse,* 15 Ohio 568, 45 Am. Dec. 590. For a collection of authorities on the subject see 23 Cyc. 1373, 17 Am. & Eng. Ency. Law (2d Ed.) 780; 1 Black on Judgments 438, Freeman on Judgments, secs. 355, 356.

In a note by Freeman to *Filley* v. *Duncan,* in 1 Neb. 134, 93 Am. Dec. 357, this subject is fully discussed and a number of authorities are cited. In order to show not merely the views of Mr. Freeman, but the great number of cases supporting his conclusion, the following extract is made from that note:

"*Attaches to actual, not apparent, interest of judgment debtor.*—The lien of a judgment attaches to the precise interest of the judgment debtor in the land. In some States it is confined to the legal interest of the debtor; but whether it extends to the legal and equitable interest, or is restricted to the legal interest only, it is the actual and not the apparent interest of the defendant that is affected, and his apparent interest can neither extend nor restrict the

operation of the lien so that it shall encumber any greater or less interest than the debtor in fact possesses: Freeman on Judgments, sec. 356; *Berkley* v. *Lamb,* 8 Neb. 392, 399, 1 N. W. 320; *Colt* v. *DuBois,* 7 Neb. 391, citing the principal case; *Unknown Heirs* v. *Kimball,* 4 Ind. 546, 58 Am. Dec. 638; *Union Bank* v. *Manard,* 51 Mo. 548; *Sandford* v. *McLean,* 3 Paige (N. Y.) 117, 23 Am. Dec. 773; *Ells* v. *Tousley,* 1 Paige (N. Y.) 280; *Morris* v. *Mowatt,* 2 Paige (N. Y.) 586, 22 Am. Dec. 661; *Ex parte Trenholm,* 19 S. C. 126; *Blankenship* v. *Douglas,* 26 Tex. 225, 82 Am. Dec. 608; *In re Estes,* 6 Saw. 459. And, therefore, where the judgment is a lien upon equitable interests, it matters not that the evidences of the debtor's interest are not of record: *Lathrop* v. *Brown,* 23 Ia. 40; *Logan* v. *Herbert,* 30 La. Ann. p. 727; *Richter* v. *Selin,* 8 Serg. & R. (Pa.) 425; *Niantic Bank* v. *Dennis,* 37 Ill. 381. And on the other hand, though he seems to have an interest, if he have none in fact no lien will attach: *Churchill* v. *Morse,* 23 Ia. 229, 92 Am. Dec. 422; *Uhl* v. *May,* 5 Neb. 157; *Holden* v. *Garrett,* 23 Kan. 98; *Lombard* v. *Abbey,* 73 Ill. 177; *Doswell* v. *Adler,* 28 Ark. 82; Freeman on Judgments, sec. 357; for the lien can extend no further than the debtor has power voluntarily to transfer or alienate the lands in satisfaction of his debt: *Coombs* v. *Jordan,* 3 Bland (Md.) 284, 22 Am. Dec. 236; and the rights of a lien holder cannot exceed those which might be acquired by a purchase from the defendant with full notice of all existing legal or equitable rights belonging to third persons: *Baker* v. *Morton,* 12 Wall. (U. S.) 150, 20 L. Ed. 262.

"*Lien Subject to Equities of Third Persons.*—And, therefore, a judgment lien on the land of the debtor is subject to every equity which existed against the land in the hands of the judgment debtor at the time of the rendition of the judgment; and courts of equity will protect such equities against the legal lien, and will limit that lien to the actual

interest which the judgment debtor has in the estate: *Blankenship* v. *Douglas,* 26 Tex. 225, 82 Am. Dec. 608, and note 612, 613; *Coombs* v. *Jordan,* 3 Bland (Md.) 284, 22 Am. Dec. 236; *Sweet* v. *Jacocks,* 6 Paige (N. Y.) 355, 31 Am. Dec. 252; *Buchan* v. *Sumner,* 2 Barb. Ch. (N. Y.) 165, 47 Am. Dec. 305; *Coster's Ex'r* v. *Bank of Georgia,* 24 Ala. 37, 64; *Wharton* v. *Wilson,* 60 Ind. 591; *Ells* v. *Tousley,* 1 Paige (N. Y.) 280; *Morris* v. *Mowatt,* 2 Paige (N. Y.) 586, 22 Am. Dec. 661; *Walke* v. *Moody,* 65 N. C. 599; *Frazer* v. *Thatcher,* 49 Tex. 26; *Floyd* v. *Harding,* 28 Gratt. (69 Va.) 401; *Goodell* v. *Blumer,* 41 Wis. 436; *Brown* v. *Pierce,* 7 Wall. (U. S.) 205, 19 L. Ed. 134; *Whitworth* v. *Gaugain,* 1 Philips 728; *Burgh* v. *Francis,* 3 Swanst. 536, note; *Finch* v. *Earl of Winchelsea,* 1 P. Wms. 277."

If the doctrine announced in *Fulkerson* v. *Taylor, supra,* were adhered to in the present case, the result would be that if the purchasers owed only one dollar of the purchase money the creditors could come in and subject property which originally cost $2,500 and is now worth probably $50,000 to the extent of its full value.

In the face of such an array of authority supported by such satisfactory reasons, I am unable to concur in so much of the opinion in *Fulkerson* v. *Taylor, supra,* as declares that "in order for a purchaser under a contract which is not required to be recorded, to be protected as to subsequent judgments against his vendor, he must, before the date of such judgment, have become invested with a perfect equitable title," by the payment of the whole of the purchase money.

It is true, as stated in *Fulkerson* v. *Taylor, supra,* that the highly equitable provision of section 2472 of the Code has no application to judgment creditors. It does not purport to deal with judgment creditors, nor can we perceive any good reason why it should. The revisors recommend-

ed, and the legislature adopted, the provision for the protection of purchasers because it was necessary to do so, but made no reference to the liability of lands in the hands of the equitable owner to judgments against his vendor, because it was unnecessary to do so. As stated in *Fulkerson* v. *Taylor, supra,* "prior to the Code of 1887, a subsequent purchaser under a contract not required to be recorded was not protected against a prior unrecorded conveyance unless he had paid the whole purchase price before he received notice of the unrecorded conveyance." This was regarded as a hardship, but it could only be corrected by legislation, and hence the provision of section 2472 of the Code. But neither prior nor subsequent to the Code of 1887 did any such hardship exist as to the equitable owner of real estate. Both before and since the revision of 1887, it has been held that where the recording acts do not interfere the judgment creditor can acquire no better right to the estate than the debtor himself has at the date of the recovery of the judgment. *Floyd* v. *Harding,* 28 Gratt. (69 Va.) 401, 407; *Dingus* v. *Minneapolis Imp. Co.,* 98 Va. 737, 37 S. E. 353.

The equitable owner, therefore, was suffering no hardship which it was necessary or proper for the legislature to remove. The recording acts did not interfere because he was claiming under a contract admitted to be valid, and which could not be recorded, because it was by parol. The extent of the liability for judgments against his vendor was measured by the interest of the vendor, as between him and his vendee, and that was the balance due on the land at the date of the judgment against his vendor. For this he was already bound and it was immaterial to him whether he paid it to his vendor, or to the vendor's creditor. He was, therefore, already amply protected and there was no necessity for any statute on the subject. His contract was valid, the recording acts did not interfere, and

his liability was limited to the balance owing on the purchase price. What more could he expect or desire?

After a purchaser of land has put his deed to record he is not required to watch the records to ascertain whether thereafter other deeds by his grantor or judgments against him are docketed or recorded, and the same is true of deeds of trust conveying the land. The registry of a deed by a subsequent purchaser is no notice to parties who have acquired their rights before the time when the deed is registered. *Bridgewater Roller Mills Co.* v. *Strough*, 98 Va. 721, 37 S. E. 290. It is said in Sheldon on Subrogation, section 80, that "a mortgagee is not bound to take notice of subsequent liens or conveyances, or of litigation which arises concerning them; and subsequent purchasers of portions of the mortgaged premises who desire to act with reference to the order of subsequent alienations by the mortgagor must notify him of the fact in proper time and request him to act accordingly. * * * If a release of a part of the mortgaged premises was given without notice of the equities of the subsequent encumbrancer or grantee, the first mortgagee who gave it is not responsible for the consequences of his act, nor is the lien of his mortgage upon the unreleased portion of the premises in any wise impaired thereby." The same principle has been applied to the docketing of judgments against the former owner of land who has made a valid contract for the sale thereof, where the purchaser is in open and notorious possession of the land, but has not yet received a deed. In *Moyer* v. *Hinman*, 13 N. Y. 180, Judge Denio said: "I consider it equally well settled that the docketing of a judgment against the vendor affords no notice of its existence either actual or constructive, to the prior vendee of the judgment debtor." Speaking of payments by the vendee to the vendor after the docketing of judgments against the vendor, he says further: "In the view of a court of equity, his con-

dition was like that of a party having a prior conveyance or lien which was duly recorded. * * * The vendee having no notice of the judgment creditor's lien, and the creditor having full notice of the vendee's situation, it would seem to be reasonable that, in order to intercept those payments and divert them from the vendor's hands to his own, the creditors ought at least to inform the vendee of the existence of his lien and his right to the unpaid purchase money." To the same effect, see *Parks* v. *Jackson*, 11 Wend. (N. Y.) 442, 25 Am. Dec. 656; *Hampson* v. *Edelen*, 2 Har. & J. (Md.) 64, 3 Am. Dec. 530; *Filley* v. *Duncan*, 1 Neb. 134, 93 Am. Dec. 337.

In the instant case, the school trustees were in the most open and notorious possession of the property long before any of the judgments were recovered against Rorer and probably before the debts were incurred by him; the dwelling was changed at an expense of $2,000 to a school building; a graded school was conducted there continuously until it was incorporated into the city; thereafter Rorer conveyed the legal title to the city school board, reciting in his deed that all the purchase money had been paid, and the city erected thereon a handsome school building, and so improved the property that what originally cost only $2,500 is now estimated by the appellants to be worth $65,000. All of this transpired without a word of notice from the judgment creditors, so far as the record discloses, until the owners of the property were made defendants to this suit, and it was sought to subject the property to the payment of appellants' judgments. Rorer was under a legal and moral obligation to convey the property to the trustees upon payment of the balance of the purchase money, and the recital in his deed is certainly admissible evidence against him that such payment had been made. The judgment creditors gave no notice of any intention to subject the property to the balance of the purchase money and have

not taken a single step since the docketing of their judgments until the institution of this suit for the protection of their interests. They allowed thirty years to elapse after the purchase of the property before they instituted their suit—the judgments being kept alive by the absence of the judgment debtor from the State—seeing large expenditures being made by the purchasers, but without one word as to liability for their judgments. Under such circumstances, I am of opinion that the school property is not liable to the judgments sought to be enforced against it. This conclusion renders it unnecessary to pass upon other questions raised in the record in relation to the school property.

It is assigned as error that the trial court refused to appoint a receiver of the property reported as liable for complainants' judgments, or to hold the parties in possession thereof liable for the use and occupation thereof, pending the final determination of this litigation. There was no error in the ruling complained of. The railway company and the school board were, in good faith and upon reasonable grounds, contesting the liability of the property owned by them to the appellants' judgments, and the owners of the other property joined with the appellants in seeking to hold the property of the railway company and the school board liable, because if these properties were held liable they would probably produce sufficient to pay off and discharge appellants' judgments and thereby relieve the property of such owners from any liability for said judgments. The rights of the parties had not been determined at the time the receiver was asked for, nor had it been ascertained and adjudicated what property should be subjected to the discharge of such judgments. In such circumstances, the appointment of a receiver whereby the parties would have been divested of the possession of their property was not proper. It would have taken from the railway company and the school board the possession of property not then

determined to be liable to complainants' judgments, and turned private persons out of homes that might never have to be resorted to for the satisfaction of such judgments.

In *Norris* v. *Lake,* 89 Va. 513, 518, 16 S. E. 663, it is said: "The appointment of a receiver is not a matter of right, but of discretion, to be governed by the circumstances of the case, one of which circumstances is the probability of the plaintiff's being ultimately entitled to a decree. It is, moreover, a power always to be exercised with caution, and never except in a strong case. The general rule is to refuse an interlocutory application for a receiver, unless the plaintiff presents at least a *prima facie* case, and the court is satisfied that there is imminent danger of loss." For authorities to the same effect in other jurisdictions, see 23 Am. & Eng. Ency. Law (2d ed.) 1038-9; 34 Cyc. 21; *Kanawha Coal Co.* v. *Ballard,* 43 W. Va. 721, 29 S. E. 514.

The First National Bank of Roanoke, by counsel, offered proof of a judgment against F. Rorer, to which counsel for the appellants objected, because the bank had refused to contribute anything to the cost of the suit. The master reported the judgment, however, and the appellants excepted to the master's report on the same ground, and the trial court overruled the exception. This ruling is assigned as error. The bank offered the proof by counsel of its own selection and could not be required to contribute to the compensation of counsel of appellants. The only other costs to which it could be required to contribute were the legal and taxable costs of the suit. If no property was disclosed in the suit, it was subject to a decree against it for its due proportion of such costs, but as the record discloses abundant property out of which the costs could be made, the question becomes one of no practical importance. There was no error in overruling the exception to the master's report.

For the reasons given I am of opinion that the decrees

98

appealed from should be affirmed so far as they affect the property claimed by the city school board of the city of Roanoke, and that they should recover their costs against the appellants; and that so far as the said decrees affect the property claimed by the Norfolk and Western Railway Company, the city of Roanoke (other than the school property aforesaid) and by Mary R. Yates, F. Fallon, Mattie L. Vest, D. C. Moomaw, W. A. Burks and B. S. Headley, they should be reversed.

Sims, J. (concurring in the result of the opinion of the majority of the court on all points involved in the case):

I concur in what is said in the opinion of Judge Whittle, P., and Judges Kelly and Prentis on the subject of the school property.

I concur in the result of the last-named opinion on the subject of the Norfolk and Western Railway Company property, on the following grounds:

As pointed out in the opinion last named, the adversary possession of the said railway company began before the liens of the judgments of appellants attached to the land in question. I think that, on the subject of such property, this is the pivotal point in the case. Upon the beginning of said adversary possession, Rorer, the judgment debtor, was ousted from the possession of the land in question. Thereupon the right of action arose—accrued—to Rorer (the person through whom the judgment creditors claim), to recover the land from the railway company's predecessors in title. The statute of limitations (section 2915 of the Code) thereupon began to run against the recovery of that land from its adversary possessors. Then Rorer no longer had the possession of the land. What he had was the bare legal title and a mere right of entry on the land and right of action to recover the possession of it. When the judgments of appellants were recovered, therefore, the

liens of such judgments could attach only to the rights of the judgment debtor to the land just named, which were all of his rights to the land, then existing. Moreover the appellants acquired their judgment liens on such rights after the statute aforesaid had begun to run in favor of said adversary possessors and against such rights, and subject, further, to the statutory provision contained in said section 2915, to the effect that if said adversary possession should continue from its beginning for the statutory period "no person shall make an entry on or bring an action to recover" said land from said adversary possessors or any of them. Having begun to run in favor of said adversary possessors, such statute, by the express terms of it, continued to run in favor of such possessors, not only against Rorer, but against every person whomsoever claiming the land thereafter through him.

It is true that the judgment creditors are not suing in the proceeding in equity before us, to recover possession of the land. They are suing to enforce the liens of their judgments. But it would be but a barren victory for them to obtain a decree for the sale of the land to satisfy their liens, since any one purchasing it under such decree would be barred by said statute from making an entry on or bringing an action to recover the land from the said railway company, the adverse possessor thereof, and consequently no one would purchase under such decree. A court of equity will not do a vain thing. In such case equity follows the law in determining the rights of parties.

Hence, I think section 2915, aforesaid, applies to the case under consideration and that the adverse possession of the railway company, which had been continued from its said beginning for more than the statutory period before this suit against the railway company was instituted, is a bar to the enforcement by the appellants of the liens of their judgments.

The opinion last named, however, goes further and holds that even if the adverse possession of the railway company had not begun until after the liens of the appellants attached, yet if it was continued for the statutory period before this suit was instituted against the railway company, it would bar the enforcement of the liens of said judgments. I cannot concur in such opinion in its going to that extent. To such a case I think that what is said in the above opinion of Judge Burks on the subject under consideration is applicable. It is there said, in substance, that by virtue of the statute law in Virginia a judgment creditor is given a statutory lien on the land of the judgment debtor as of the date the judgment lien attaches thereto, so that no subsequent acts of the judgment debtor, or subsequent acts of others ousting him from the possession of the land, can affect such statutory lien, so long as the judgment is alive; and that if such lien is enforced pursuant to such statute law, the conveyance under the decree of court operates, by virtue of such statute law, to pass the land to the grantee thereof with the right and title thereto standing precisely as it stood in the hands of the judgment debtor as of the date the judgment lien attached. I concur fully in all of this. And I agree that in case of the ouster of a judgment debtor from his possession of his land after the lien of a judgment against him has attached thereto, such ouster could not operate to affect the lien of the judgment or the right of entry on or of action to recover the land on the part of a subsequent purchaser of it under a decree of court selling the land to satisfy such lien. The adversary possession being taken at a point of time after the judgment lien attached, it would come too late to affect the lien of the judgment given and already fixed as of the time aforesaid by the statute law on that subject (cited by Judge Burks), and made by such statute law to continue co-existent with the life of the judgment. As applicable to

such a case, I agree with what is said by Judge Burks in regard to the statute of limitations (section 2915) never beginning to run against the lien of the judgment. In such case no right of action would accrue to the judgment debtor prior to the time when the judgment creditor acquired his lien. It is only prior to such time that the judgment creditor, or a subsequent purchaser of the land under decree of court enforcing the judgment, can be said to claim through the judgment debtor. After such time the judgment creditor claims under and by virtue of the statute alone, and the lien given thereby, which is freed by the statute law from being affected by subsequent acts of the judgment debtor or of others suffered by him, unless indeed section 2915 affects the case. It is not claimed by any one that there is any other statute which could affect the case. Section 2915, as we have above seen, can affect the case only where the judgment creditor and subsequent purchaser aforesaid claim through the judgment debtor as of a time when the latter has been ousted of his possession so that the right of action to recover the land of the adversary possessor has arisen—which is not so in a case such as is now referred to. Hence, section 2915, aforesaid, cannot in such case affect the existence of the lien.

For the reasons stated in the next preceding paragraph, I cannot agree with Judge Burks in his conclusion on the subject under consideration, since they strengthen me in the conclusion that section 2915 does apply to a case where the adversary possession began before the judgment lien attached, and because of this conclusion I concur in the result of the opinion of Judge Whittle, P., and Judges Kelly and Prentis on the subject of the Norfolk and Western Railway Company's property, as above stated.

With the exceptions I have above noted, I concur in the opinion of Judge Burks on all other questions in the cause before us covered thereby.

*Affirmed in Part; Reversed in Part.*